**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>Unique Fitness Concepts , LLC<br><br>Debtor. | Chapter 11<br><br>Case No. 24-01183<br><br>Hon. Jacqueline P. Cox |

**PLAN OF REORGANIZATION**

**Dated June 27, 2024**

Filed by:

**Unique Fitness Concepts , LLC**

Attorneys for Debtor
E. Philip Groben
Email: pgroben@gcklegal.com
Gensburg Calandriello & Kanter, P.C.
200 West Adams Street
Chicago, Illinois 60606
Tele. (312) 263-2300
Fax. (312) 263-2242

Unique Fitness Concepts , LLC ("**Debtor**" or "**Unique Fitness**"), pursuant to Sections 1123, 1189, and 1190 of Title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 3016 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), proposes this Plan of Reorganization (the "**Plan**") for the resolution of the Claims against Debtor.  Debtor is the proponent of this Plan as required under Section 1191 of the Bankruptcy Code.

In summary, but subject to more specific details provided herein, the Plan provides for the reorganization of the Debtor, with creditor claims paid as provided herein from the cash flow of Unique Fitness generated from operations.  The Plan contemplates that secured creditors will be paid in full to the extent of their Allowed Secured Claims, as will administrative claimants and Priority Claims.  The Allowed Claims of Unsecured Creditors will receive twelve (12) quarterly disbursements from Unique Fitness's deposable income, as that term is defined herein. Under the Plan, the Holders of Allowed Equity Interests in Unique Fitness will retain their interests but receive no payments or distributions on account of those interests until Secured and Unsecured Creditors receive their payments under the Plan.

Subject to certain restrictions and requirements, including those set forth in Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications to the Plan set forth in Sections 14.1 through 14.4 of the Plan, the Debtor expressly reserves the right to alter, amend, modify, revoke or withdraw the Plan, one or more times, prior to the Plan's substantial consummation.

IN THE OPINION OF THE DEBTOR, THE TREATMENT OF CLAIMS UNDER THE PLAN CONTEMPLATES A RECOVERY NOT LESS THAN THAT WHICH IS LIKELY TO BE ACHIEVED IN A LIQUIDATION OF THE DEBTOR UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.  ACCORDINGLY, UNIQUE FITNESS BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS, AND THE DEBTOR RECOMMENDS THAT CREDITORS VOTE TO ACCEPT THE PLAN.

**Article 1**
**Contents of the Plan; Required Disclosures**

1.1     *Subchapter V Plan of Reorganization*. This Plan is filed under Subchapter V of Chapter 11 of the Bankruptcy Code.

1.2     *Nature and History of the Debtor's Business Operations*.

The Debtor is an Illinois limited liability company, organized in May 2006.  As of the Petition Date, the Debtor employed two persons.  The Debtor is wholly owned by non-debtor individuals Harvey Reich and Lori Reich.  The Debtor operates entirely online where it sells home consumer exercise and medical equipment.  Prior to the filing of its Voluntary Petition the Debtor maintained merchant accounts ("Merchant Accounts") with certain online retail platforms including Amazon.com, Ebay.com, and Walmart ("Retail Platforms").  The Retail Platforms consider each merchant account to be unique to a particular user of their platform, and the Debtor is therefore prohibited from opening a second or subsequent account with each particular Retail Platform.  The Debtor used the Retail Platforms to sell merchandise directly to consumers.

The COVID-19 pandemic had a whiplash effect upon the Debtor's operations. At first, as consumers spent more time at home, the market for consumer exercise equipment blossomed. However, in response to the surge in online consumer transactions, online payments processors began demanding holdbacks which throttled the Debtor's cash flow and caused a liquidity crisis. The Debtor sought financing to see it through this time, but given the high interest rates and other onerous terms the Debtor was ultimately unable to find a break even point, thus necessitating the filing of this chapter 11 proceeding.

On March 14, 2024, the Bankruptcy Court entered an order granting, among other relief, the Debtor's Motion to extend the automatic stay of Bankruptcy Code §362(a) to enjoin collection activities, initiated prepetition by Kapitus Servicing, Inc., Fundation Group LLC, Bankers Health Group, LLC, and BMO Harris Bank, N.A., against Harvey Reich and/or Lori Reich ("**Order Extending Stay**"). For more detail, see Docket No. 37.

1.3   *Current Management and Employees*.

1.3.1   Directors and Officers of Reorganized Debtor.

As of the petition date, the Debtor's sole shareholders were Harvey and Lori Reich, each of whom owns 50% of Unique Fitness's membership interest. Harvey Reich is Unique Fitness's Chief Executive Officer.

*1.3.1.1* Insiders Employed by Reorganized Debtor.

Harvey Reich is employed fulltime by Debtor. As of the filing of this Plan Harvey is not drawing a salary; but once Unique Fitness generates weekly revenues in excess of $1,512,000.00 he will receive a salary of annually. Lori Reich works part time for the Debtor and does not currently draw a salary.

1.4   *Alternative Confirmation Standards Under Section 1191(a) and (b).* Debtor seeks to confirm this Plan by obtaining the consent of all Impaired Classes provided for in this Plan by a majority in number and two-thirds in amount of Allowed Claims actually voting. If Debtor succeeds in obtaining the accepting vote (i.e. consent) of all Impaired Classes, the provisions of the Plan referencing and operating under section 1191(a) of the Bankruptcy Code will apply as described herein. If Debtor is unable to obtain the accepting vote (i.e. consent) of all Impaired Classes, Debtor will request the Court to confirm the Plan under 1191(b) and the provisions of the Plan referencing and operating under section 1191(b) of the Bankruptcy Code will apply as described herein.

1.5   *Property and Claims.* This Plan deals with all property of Unique Fitness and provides for treatment of all Claims against Unique Fitness and its property.

**Article 2**
**Definitions and General Provisions**

For the purposes of this Plan, except as otherwise expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in this Article of the Plan.  Any term that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term therein.

2.1    *Definitions.* The following terms, when used in this Plan, shall have the following meaning:

2.1.1. "***Administrative Expense***" means (a) any cost or expense of administration of the Bankruptcy Case under Section 503(b) or 507(a)(2) of the Bankruptcy Code, to the extent the party claiming any such cost or expense files an application, motion, request or other Bankruptcy Court-approved pleading seeking such expense in the Bankruptcy Case on or before the applicable Administrative Expense Claim Bar Date, including (i) any actual and necessary costs and expenses of preserving the Estate or operating the business of the Debtor (including wages, salaries, or commissions for services rendered) incurred on or after the Petition Date, (ii) any Postpetition cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtor in Possession in the ordinary course of its businesses, (iii) any Claim granted administrative priority status by a Final Order of the Bankruptcy Court, (iv) any Claim by a Governmental Unit for taxes (and for interest and/or penalties related to such taxes) due from the Debtor for any Postpetition tax year or period, and (v) compensation or reimbursement of expenses of Professionals awarded or allowed pursuant to an order of the Bankruptcy Court under Sections 330(a) or 331 of the Bankruptcy Code (including any amounts held back pursuant to an order of the Bankruptcy Court); (b) all fees and charges assessed against the Estate under Chapter 123 of Title 28, United States Code, 28 U.S.C. §§ 1911-1930; and (c) any and all other costs or expenses of administration of the Bankruptcy Case that are allowed by a Final Order of the Bankruptcy Court; provided, however, that, when used in the Plan, the term "Administrative Expense" shall not include any Priority Tax Claim, any Cure Claim, any Disallowed Claim, or, unless otherwise expressly provided in the Plan, any of the Claims in Classes 1 through 10 means a Claim for payment of an administrative expense entitled to priority under section 507(a)(2) of the Bankruptcy Code.

2.1.2 "***Administrative Expense Claim***" means any Claim for the payment of an Administrative Expense.

2.1.3 "***Administrative Expense Claim Bar Date***" means the date(s) established by one or more orders of the Bankruptcy Court as the deadline for the filing by any Creditor or other party in interest (including any Professional) of an application, motion, request or other Bankruptcy Court-approved pleading for allowance of any Administrative Expense Claim. Any Holder of an Administrative Expense Claim (including a Holder of a Claim for Postpetition federal, state or local taxes) that does not file an application, motion, request or other Bankruptcy Court-approved pleading by the applicable Administrative Expense Claim Bar Date shall be forever barred, estopped and enjoined from ever asserting such Administrative Expense Claim against the Debtor, or any of its properties or against the Estate, and such Holder shall not be entitled to participate in any Distribution under the Plan

on account of any such Administrative Expense Claim.  Administrative Expense Claims for any fees and charges assessed against the Estate pursuant to Section 1930 of Title 28 of the United States Code and any fees, costs and expenses incurred by the Debtor in administering the provisions of the Plan prior to the Effective Date, shall be exempt from the Administrative Expense Claim Bar Date.

2.1.4     "*Allowed Administrative Expense Claim*" means an Administrative Expense Claim that has been allowed pursuant to a Final Order in accordance with Article 6.3 of this Plan.

2.1.5     "*Allowed Claim*" means a Claim or that portion of a Claim which is not a Disputed Claim or a Disallowed Claim and (a) as to which a Proof of Claim was filed on or before the Bar Date or the Governmental Unit Bar Date, as applicable, or, by order of the Bankruptcy Court, was not required to be so filed, or (b) as to which no Proof of Claim was filed on or before the Bar Date or the Governmental Unit Bar Date, as applicable, but which has been or hereafter is listed by the Debtor in its Schedules as liquidated in amount and not disputed or contingent and, in the case of subparagraph (a) and (b) above, as to which either (i) no objection to the allowance of such Claim has been filed within the time allowed for the making of objections as fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court, or (ii) any objection as to the allowance of such Claim has been settled or withdrawn or has been overruled by a Final Order.  "Allowed Claim" shall also include a Claim that is allowed by the Bankruptcy Court in a Final Order.

2.1.6     "*Allowed Equity Interest*" means any Equity Interest (a) which is memorialized in the books and records maintained by Unique Fitness and (b) which either (i) is not a Disputed Equity Interest or (ii) has been Allowed by a Final Order of the Bankruptcy Court.

2.1.7     "*Assumed Contracts*" means contracts assumed pursuant to the terms of Article 10 of the Plan and Section 365 of the Bankruptcy Code.

2.1.8     "*Avoidance Action*" means any claim or cause of action of the Estate arising out of or maintainable pursuant to sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code or any other similar applicable law or section of the Bankruptcy Code, regardless of whether such action has been commenced prior to the Effective Date.

2.1.9     "*Ballot*" means the ballot accompanying this Plan Disclosure Statement and the Plan, on which Holders of Impaired Claims entitled to vote on the Plan may indicate their acceptance or rejection of the Plan in accordance with the Voting Instructions.

2.1.10    "*Bankruptcy Case*" means the case of the Debtor currently pending before the Bankruptcy Court under Chapter 11 of the Bankruptcy Code, which case was commenced by the Debtor on the Petition Date and presently bears Case No's. 24-01183.

2.1.11    **"*Bankruptcy Code*"** means the Bankruptcy Reform Act of 1978, as subsequently amended and as principally set forth in Sections 101 et seq., of Title 11 of the United States Code.

2.1.12    **"*Bankruptcy Court*"** means the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division.

2.1.13    **"*Bankruptcy Rules*"** means the rules of procedure applicable to the Case pending before the Bankruptcy Court, as amended.

2.1.14    "***Bar Date***" means April 10, 2024, as the last date and time for each entity to file a proof of claim based on a prepetition claim.  Governmental Units were excluded from the Bar Date.

2.1.15    "***Business Day***" means any day other than (a) a Saturday, (b) a Sunday, (c) a legal holiday (as "legal holiday" is defined in Bankruptcy Rule 9006(a)), or (d) a day on which commercial banks in Chicago, Illinois are required or authorized to close by law.

2.1.16    "***Cash***" means cash, cash equivalents and other readily marketable direct obligations of the United States, as determined in accordance with generally accepted accounting principles, including bank deposits, certificates of deposit, checks and similar items.  When used in the Plan with respect to a Distribution under the Plan, the term "Cash" means lawful currency of the United States, a certified check, a cashier's check, or a wire transfer of immediately available funds from any source.

2.1.17    "***Causes of Action***" means any and all actions, claims, demands, rights, defenses, counterclaims, suits and causes of action of the Debtor or its Estate, whether known or unknown, in law, equity or otherwise, against any Creditor or other third party, including (a) the Avoidance Actions, and (b) any and all other claims or rights or proceedings of any value whatsoever, at law or in equity, turnover actions and claims of the type referred to in the Disclosure Statement or in Section 8.3 of the Plan.  When used in the Plan, the term "Causes of Action" shall not include any claims, obligations, suits, judgments, damages, rights, remedies, causes of action, charges, costs, debts, indebtedness, or liabilities released or waived by either the Debtor or its Estate pursuant to a Final Order of the Bankruptcy Court.

2.1.18    "***Claim***" has the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code.  Notwithstanding anything to the contrary contained herein, when used in the Plan, the term "Claim" shall be given the broadest possible meaning permitted by applicable law and shall include all manner and type of claim, whenever and wherever such claim may arise.

2.1.19    "***Class***" means a category of Claims or Equity Interests classified together as described in Articles 3 and 4 of the Plan.

2.1.20      "*Collateral*" means property in which the Estate has (or had) an interest and that secures (or secured), in whole or part, whether by agreement, statute, or judicial decree, the payment of a Claim.

2.1.21      "*Confirmation*" or "*Confirmation of the Plan*" means the confirmation of the Plan by the Bankruptcy Court pursuant to Sections 1129 and 1191 of the Bankruptcy Code.

2.1.22      "*Confirmation Date*" means the date on which the Confirmation Order is entered on the Docket by the Clerk pursuant to Bankruptcy Rule 5003(a).

2.1.23      "*Confirmation Hearing*" means the hearing before the Bankruptcy Court held to consider confirmation of this Plan and related matters under Section 1191 of the Bankruptcy Code, as such hearing may be continued.

2.1.24      "*Confirmation Order*" " means the order confirming this Plan pursuant to section 1191 of the Bankruptcy Code that the Bankruptcy Court enters, which shall be in all respects reasonably acceptable to Debtor.

2.1.25      "*Creditor*" means the Holder of a Claim, within the meaning of Section 101(10) of the Bankruptcy Code, including Secured Creditors, Unsecured Creditors, and Creditors with Administrative Expense Claims, Priority Tax Claims, Priority Claims and Cure Claims.

2.1.26      "*Debtor*" means Unique Fitness Concepts , LLC, the debtor in this Bankruptcy Case.

2.1.27      "*Determination Date*" means the later of (i) the Effective Date and (ii) the date the order of the Bankruptcy Court allowing a Claim becomes a Final Order (if applicable).

2.1.28      "*Disallowed Claim*" means any Claim which has been disallowed by an order of the Bankruptcy Court, which order has not been stayed pending appeal.

2.1.29      "*Disputed Claim*" means any Claim or portion thereof (other than a Disallowed Claim) that is not an Allowed Claim and (a) as to which a Proof of Claim has been filed or is deemed filed under applicable law or order of the Bankruptcy Court, or (b) which has been scheduled in the Schedules, and, in the case of subparagraph (a) and (b) above, as to which an objection has been or may be timely filed or deemed filed under the Plan, the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court and any such objection has not been (i) withdrawn, (ii) overruled by an order of the Bankruptcy Court, or (iii) sustained by an order of the Bankruptcy Court.  In addition to the foregoing, a Disputed Claim shall mean a Claim that is not an Allowed Claim, whether or not an objection has been or may be timely filed, if (a) the amount of the Claim specified in the Proof of Claim exceeds the amount of any corresponding Claim scheduled in the Schedules, (b) the classification of the Claim specified in the Proof of Claim differs from the

classification of any corresponding Claim scheduled in the Schedules, (c) any corresponding Claim has been scheduled in the Schedules as disputed, contingent or unliquidated, (d) no corresponding Claim has been scheduled in the Schedules, or (e) such Claim is reflected as unliquidated or contingent in the Proof of Claim filed in respect thereof.  To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Disputed Claim only to the extent of the amount subject to objection.  "Disputed", when used as an adjective herein (such as Disputed Administrative Expense Claim, Disputed Priority Tax Claim, Disputed Priority Claim, Disputed Secured Claim, and Disputed Unsecured Claim), has a corresponding meaning.

2.1.30    "**Distribution**" means a distribution of Cash to a Creditor on account of an Allowed Claim or to an Equity Interest Holder on account of an Allowed Equity Interest pursuant to the terms of the Plan.

2.1.31    "**Distribution Date**" means, when used with respect to an Allowed Administrative Expense Claim (including Allowed Administrative Expense Claims of Professionals), the date which is as soon as reasonably practicable (as determined by the Debtor) after the later of the Effective Date, or the Determination Date, but in no event more than five (5) days after the Determination Date.  "Distribution Date," when used with respect to an Allowed Priority Tax Claim, means the date or dates for any Distribution to Holders of Allowed Priority Tax Claims as provided in the Plan, unless such date or dates have been otherwise established by an order of the Bankruptcy Court.

2.1.32    "**Effective Date**" means, and shall occur on, the first Business Day on which all of the conditions precedent to the occurrence of the Effective Date have been satisfied or waived as provided therein.

2.1.33    "**Enjoined Parties**" shall mean BMO Bank, Kapitus Servicing, Bankers Healthcare Group, Goldman Sachs Bank, and Fundation Group.

2.1.34    "**Equity Interests**" means the interests in Unique Fitness represented by the membership interests of Unique Fitness issued and outstanding on the Petition Date.

2.1.35    "**Estate**" means the estate created for Unique Fitness by Section 541 of the Bankruptcy Code upon the commencement of the Bankruptcy Case.

2.1.36    "**Executory Contract**" means a contract or lease to which the Debtor is a party that is subject to assumption or rejection under Sections 365 or 1123 of the Bankruptcy Code.

2.1.37    "**Final Decree**" means the final decree for the Bankruptcy Case entered by the Bankruptcy Court after the Effective Date pursuant to Bankruptcy Rule 3022.

2.1.38    "**Final Order**" means (a) an order, judgment, ruling or other decree (or any revision, modification or amendment thereto) issued and entered by the Bankruptcy Court or by any state or other federal court as may have jurisdiction over any proceeding in

connection with the Bankruptcy Case for the purpose of such proceeding, which order, judgment, ruling or other decree has not been reversed, vacated, stayed, modified or amended and as to which (i) no appeal, petition for review, reargument, rehearing, reconsideration or certiorari has been taken and is pending and the time for the filing of any such appeal, petition for review, reargument, rehearing, reconsideration or certiorari has expired, or (ii) such appeal or petition has been heard and dismissed or resolved and the time to further appeal or petition has expired with no further appeal or petition pending; or (b) a stipulation or other agreement entered into which has the effect of any such aforesaid order, judgment, ruling or other decree with like finality.

2.1.39    "*Governmental Unit*" has the meaning ascribed to such term in Section 101(27) of the Bankruptcy Code.

2.1.40    "*Holder*" means (a) as to any Claim, (i) the owner or holder of such Claim as such is reflected on the Proof of Claim filed with respect to such Claim, or (ii) if no Proof of Claim has been filed with respect to such Claim, the owner or holder of such Claim as such is reflected on the Schedules or the books and records of the Debtor or as otherwise determined by order of the Bankruptcy Court, or (iii) if the owner or holder of such Claim has assigned or transferred the Claim to a third party and the Debtor, as the case may be, has received sufficient written evidence of such assignment or transfer, the assignee or transferee; and (b) as to any Equity Interest, the record owner or holder of such Equity Interest as shown on the stock register that is maintained by Unique Fitness or as otherwise determined by order of the Bankruptcy Court.

2.1.41    "*Impaired*" refers to any Claim or Equity Interest that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

2.1.42    "*Initial Distribution Date*" means the Effective Date.

2.1.43    "*Injunction Commitment*" means those additional funds identified in Exhibit C the Debtor may pay to the BMO Bank, Kapitus Servicing, Bankers Healthcare, Rocket Capital, Goldman Sachs, and Fundation.  The Injunction Commitment shall be disbursed *pro rata* to the Enjoined Parties.

2.1.44   "*Lien*" means, with respect to any property, any mortgage, pledge, security interest, lien, right of first refusal, option or other right to acquire, assignment, charge, claim, easement, conditional sale agreement, title retention agreement, defect in title, or other encumbrance or hypothecation or restriction of any nature pertaining to or affecting such property, whether voluntary or involuntary and whether arising by law, contract or otherwise.

2.1.44    "*Person*" means any person, individual, corporation, association, partnership, limited liability company, joint venture, trust, organization, business, government, governmental agency or political subdivision thereof, or any other entity or institution of any type whatsoever, including any "person" as such term is defined in Section 101(41) of the Bankruptcy Code.

2.1.45    "*Petition Date*" means November 7, 2023, the date on which the Debtor commenced its Bankruptcy Case by filing its voluntary petition under Chapter 11 of the Bankruptcy Code.

2.1.46    "*Plan*" means this Plan of Reorganization of Unique Fitness Concepts , LLC under Chapter 11 of Title 11, United States Code, and all Exhibits attached hereto, as the same may be amended, supplemented, modified or amended and restated from time to time in accordance with the provisions of the Plan and the Bankruptcy Code.

2.1.47    "*Postpetition*" means arising or accruing on or after the Petition Date and before the Effective Date.

2.1.48    "*Prepetition*" means arising or accruing prior to the Petition Date.

2.1.49    "*Priority Claim*" means a Claim that is entitled to a priority in payment pursuant to Sections 507(a)(4) and (5) of the Bankruptcy Code and that is not an Administrative Expense Claim, a Priority Tax Claim, a Secured Claim, or an Unsecured Claim.

2.1.50    "*Priority Tax Claim*" means a Claim of a Governmental Unit that is entitled to a priority in payment pursuant to Section 507(a)(8) of the Bankruptcy Code and that is not an Administrative Expense Claim, a Priority Claim, a Secured Claim, or an Unsecured Claim.

2.1.51    "*Professional*" means any professional employed in the Bankruptcy Case pursuant to an order of the Bankruptcy Court, pursuant to Sections 327 or 1103 of the Bankruptcy Code.

2.1.52    "*Proof of Claim*" means a proof of claim filed with the Bankruptcy Court with respect to a Claim against the Debtor pursuant to Bankruptcy Rules 3001, 3002 or 3003.

2.1.53    "*Pro Rata Share*" means, with respect to any Distribution under the Plan to the Holder of an Allowed Claim in a particular Class or otherwise, a fraction, the numerator of which shall be the amount of such Holder's Allowed Claim and the denominator of which shall be the sum of all Allowed Claims and all Reserved Claims in such Class and, if applicable, other Classes, all determined as of the applicable Distribution Date.

2.1.54    "*Reich Injunction*" means the enjoinment of any collection activities of the Enjoined Parties against Harvey or Lori Reich.  The Reich Injunction shall be condition upon: (i) the Debtors not defaulting under the terms of this Plan, (ii) the Debtor making the Injunction Commitment payments identified in Exhibit C, and (iii) the subordination in right of payment of Allowed Insider Claims, if any.

2.1.55    "*Reich Release*" means the release of the Enjoined Parties of all claims against Harvey Reich and/or Lori Reich, except for any claim or right to payment the Enjoined Parties are entitled to under this Plan.  The Reich Release shall be condition upon: (i) the Debtors

not defaulting under the terms of this Plan, (ii) the Debtor making all Injunction Commitment payments identified in Exhibit C, and (iii) the subordination in right of payment of Allowed Insider Claims, if any.

2.1.56 "*Rejected Contracts*" has the meaning ascribed to such term in Article 10 of the Plan and Section 365 of the Bankruptcy Code.  A list of the Rejected Contracts is set forth in **Exhibit A** attached to the Plan.

2.1.57     "*Schedules*" means, collectively, Schedules A, B, D, E, F, G, and H filed by the Debtor in its Bankruptcy Case pursuant to Bankruptcy Rule 1007, as any of such Schedules has been or may hereafter be amended or supplemented from time to time.

2.1.58     "*Secured Claim*" means any Claim of a Creditor that is (a) secured in whole or in part, as of the Petition Date, by a Lien (i) on Collateral and (ii) which is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or (b) subject to setoff under Section 553 of the Bankruptcy Code, but, with respect to both (a) and (b) above, only to the extent of the value of such Creditor's interest in the Estate's interest in such Collateral or the amount subject to setoff, as the case may be.  Except as otherwise provided in the Plan, if the value of a Creditor's interest in the Estate's interest in such Collateral or the amount subject to setoff is less than the amount of the Allowed Claim, then such deficiency shall constitute an Unsecured Claim.

2.1.59     "*Secured Creditor*" means any Creditor holding a Secured Claim.

2.1.60     "*Subchapter V Trustee*" means Robert P. Handler who was appointed by the United States Trustee under section 1183(a) of the Bankruptcy Code to serve as the Subchapter V trustee in this Bankruptcy Case, and any successor trustee to Mr. Handler.

2.1.61     "*Unimpaired*" means a Claim that is not Impaired.

2.1.62     "*United States Trustee*" means the Office of the United States Trustee for the Northern District of Illinois.

2.1.63     "*Unsecured Claim*" means any Claim which is not an Administrative Expense Claim, Priority Tax Claim, Priority Claim, Secured Claim, or Cure Claim, including (a) any Claim arising from the rejection of an executory contract or unexpired lease under Section 365 of the Bankruptcy Code, (b) except as otherwise provided in the Plan, any portion of a Claim to the extent the value of the Creditor's interest in the Estate's interest in the Collateral securing such Claim is less than the amount of the Allowed Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Allowed Claim, as determined pursuant to Section 506(a) of the Bankruptcy Code, (c) any Claim arising from the provision of goods or services to the Debtor prior to the Petition Date, and (d) any Claim designated as an Unsecured Claim elsewhere in the Plan or in the Confirmation Order.

2.1.64     "*Unsecured Creditor*" means any Creditor holding an Unsecured Claim.

2.1.65    "***Voting Instructions***" means the instructions for voting on the Plan contained in the section of the Disclosure Statement entitled "Voting Instructions" and in the Ballot.

2.2    *Capitalized Terms*:  Any capitalized term used in the Plan that is not defined in the Plan but that is defined in the Bankruptcy Code or in the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or in the Bankruptcy Rules, as the case may be (with the Bankruptcy Code or the Bankruptcy Rules, as the case may be, controlling in the case of a conflict or ambiguity).

2.3    *Rules of Construction*:  For purposes of the Plan: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) any reference in the Plan to a contract, instrument, or other agreement or document being in a particular form or on particular terms and conditions means that such contract, instrument, or other agreement or document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or Exhibit means such document or Exhibit as may be amended, modified or supplemented; (d) if the Plan's description of the terms of an Exhibit is inconsistent with the terms of the Exhibit, the terms of the Exhibit shall control; (e) unless otherwise specified, all references in the Plan to Articles and Exhibits are references to Articles and Exhibits of or to the Plan; (f) unless the context requires otherwise, the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular Article or section or subsection of the Plan; (g) any phrase containing the term "include" or "including" shall mean including without limitation; (h) all of the Exhibits referred to in the Plan shall be deemed incorporated herein by any such reference and made a part hereof for all purposes; (i) any reference to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; and (j) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply in the construction of the Plan, to the extent such rules are not inconsistent with any other provision in this Section 2.3.

2.4    *Time*.  Whenever the time for the occurrence or happening of an event as set forth in this Plan falls on a day which is a Saturday, Sunday, or legal holiday under the laws of the United States of America or the State of Illinois, then the time for the next occurrence or happening of said event shall be extended to the next day following which is not a Saturday, Sunday, or legal holiday.

2.5    *Events of Default*.    Unless otherwise specifically provided in a class under the Plan, in the event of a default by Debtor in payments or otherwise pursuant to the Plan, the Holder must send written notice (the "**Default Notice**") to Debtor at the addresses of record for Debtor as reflected on the docket for this Bankruptcy Case, unless Debtor has provided the Holder with a written notice of a change of address.  Such Default Notice must contain the reason for the default, and if such default is monetary, the amount of the default and amount necessary to cure the default, as well as notice that Debtor has ten (10) days (in the case of a monetary default) and thirty (30) days (in the case of a non-monetary default) from receipt by Debtor and Debtor's counsel of the Default Notice (or the following business day if the 10th or 30th day does not fall on a business day) to cure such default (and the address for payment, which

will accept overnight deliveries, in the event of a monetary default). The Holder must send such Default Notice to (a) Debtor via certified mail or recognized overnight carrier with a copy to Debtor via email and (b) by certified mail or recognized overnight carrier to E. Philip Groben III (Gensburg, Calandriello & Kanter, P.C.) at the address reflected in the then current directory of the State of Bar of Illinois with a copy via email. Debtor shall have ten (10) days or thirty (30) days (as applicable) from Debtor's and Debtor's counsel's receipt of the Default Notice to cure such default. Receipt by Debtor's attorney shall not be deemed receipt by Debtor of the required Default Notice. Notwithstanding anything to the contrary in the Plan or otherwise, a default under one Class of Claims or sub-class of Claims shall not constitute a default under any other Class of Claims or sub-class of Claims. (For example, a default under Class 1 shall not constitute a default under Class 2). In the event of a default under the Plan as to any creditor or creditors and Debtor's cure of any such default, then the terms of the Plan shall remain in effect and Debtor shall then be deemed to be in compliance with the Plan and the injunction (or automatic stay, as applicable) as to such creditor or creditors shall be and remain unaffected without further order, action or notice, and without limitation, such creditor or creditors shall be enjoined from taking any actions prohibited by the terms of the Plan.

2.6     *Remedies in the Event of Default*. In the event of an uncured default, then such affected creditor may take any action provided for by law to enforce the terms of the Plan, but the injunction of the Plan (or automatic stay, as applicable) shall remain in place to prohibit any action other than to enforce the terms of the Plan. Without limitation, a secured creditor may enforce any lien provided under this plan and an unsecured creditor may file an action for breach of contract to enforce any amounts due under the Plan.

2.7     *Notices*. All notices under the Plan shall be in writing. Unless otherwise specifically provided herein, all notices shall be sent to Debtor via U.S. Certified Mail Return Receipt or by recognized overnight carrier to the address of record for Debtor in this Case, unless Debtor has provided such Holder with written notice of change of address for Debtor, with a copy via email and certified mail or nationally recognized overnight delivery service to E. Philip Groben III (Gensburg, Calandriello & Kanter, P.C.) at the address reflected in the then current directory of the State Bar of Illinois. Receipt of notice by E. Philip Groben III (Gensburg, Calandriello & Kanter, P.C.) shall not be deemed receipt by Debtor of the required notice. Notice to creditors may be provided (a) at the address set forth on the proof of claim filed by such Holder, (b) at the address set forth in any written notices of address change delivered to Debtor after the date of any related proof of claim, (c) at the addresses reflected in the Schedules if no proof of claim has been filed and Debtor has not received a written notice of a change of address, or (d) if the Holder's address is not listed in the Schedules, at the last known address of such Holder according to the Debtor's books and records.

## Article 3
## Summary Classification of Claims and Interests

3.1     In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative and Priority Tax Claims have not been classified in the Plan. The treatment of unclassified claims is described in Article 6. Other than Administrative Expense Claims and Priority Tax

Claims, the Plans divide all Claims against the Debtors into various Classes. The Tables set forth below summarizes the Classes of Claims and Interests under the Plans, the treatment of Claims and Interests, and projected recovery for Holders of Allowed Claims and Interests in such Classes and the entitlement of Holders of Claims and Interests in such Classes to vote to accept or reject the Plans.

3.2    Classes: In accordance with Section 1122 of the Bankruptcy Code, the Plan separates the claims of parties in interest into the following classes. Additional detail with respect to the classes and treatment of claims is provided in Section 3.3 and Article 4.

> Class 1 consists of the Secured Claim of BMO Bank, N.A.
> Class 2 consists of the Secured Claim of Amazon Capital Services, Inc.
> Class 3 consists of the Secured Claim of Kapitus Servicing, Inc.
> Class 4 consists of the Secured Claim of Bankers Healthcare Group, LLC
> Class 5 consists of the Secured Claim of Cloudfund
> Class 6 consists of the Secured Claim of Rocket Capital NY, LLC
> Class 7 consists of the Secured Claim of Fundation Group
> Class 8 consists of the Secured Claim of Goldman Sachs Bank
> Class 9 consists of the General Unsecured Claims.
> Class 10 consists of the Equity Interest.

3.3.    <u>Summary, Classification, and Treatment of Allowed Claims and Interests</u>

| Claim | Estimated Amounts of Claims | Proposed Treatment by Plan | Projected Recovery Under the Plan |
|---|---|---|---|
| Administrative Expense Claims | Est. $50,000.00[1] | Payment in full in cash. | 100% |
| Priority Tax Claims | $24,681.54[2] | Payment in full in cash. | 100% |

| Class | Claim(s) Included in Class | Proposed Treatment of Class by Plan | Estimated Class $ Size | Projected Recovery | Status/Voting Rights |
|---|---|---|---|---|---|
| 1 | BMO Bank, N.A. | 36 Month | $36,255.12 | 100% | Impaired /Yes |
| 2 | Amazon Capital Services, Inc. | The lien shall be avoided pursuant to 11 U.S.C. §506(a) in its entirety. | $0.00 | 100% | Unimpaired/No |
| 3 | Kapitus Servicing, Inc. | The lien shall be avoided pursuant to 11 U.S.C. §506(a) in its entirety. | $0.00 | 100% | Unimpaired/No |

---

[1] Subject to Bankruptcy Court Approval.
[2] The Claim filed by the Unites States Department of Treasury, Proof of Claim 3-1, reflects estimated taxes and as such the amount of the claim is subject to amendment.

| 4 | Bankers Healthcare Group, LLC | The lien shall be avoided pursuant to 11 U.S.C. §506(a) in its entirety. | $0.00 | 100% | Unimpaired/No |
| 5 | Cloudfund | The lien shall be avoided pursuant to 11 U.S.C. §506(a) in its entirety. | $0.00 | 100% | Unimpaired/No |
| 6 | Rocket Capital | The lien shall be avoided pursuant to 11 U.S.C. §506(a) in its entirety. | $0.00 | 100% | Unimpaired/No |
| 7 | Fundation Group | The lien shall be avoided pursuant to 11 U.S.C. §506(a) in its entirety. | $0.00 | 100% | Unimpaired/No |
| 8 | Goldman Sachs Bank | The lien shall be avoided pursuant to 11 U.S.C. §506(a) in its entirety. | $0.00 | 100% | Unimpaired/No |
| 9 | General Unsecured Claims | Except to the extent that the Holder of an Allowed General Unsecured Claim agrees to less favorable treatment to such Holder, in exchange for full final satisfaction, settlement, release and compromise of each Allowed General Unsecured Claim, the Debtor will pay the Holders their pro rata share of the Debtor's disposable income in accordance with the Plan Payment Procedures set forth in Section 4.13 of the Plan. | $1,123,016.91 | 14% | Impaired/Yes |
| 10 | Interest Claims | Holders of Allowed Equity Interests shall retain their interests but shall not be entitled to any dividends or other distributions unless and until Allowed Claimants in Classes 1 through 4 receive in full their payments provided under the Plan. | N/A | N/A | Impaired /Yes |

3.4    The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to each claimants contractual and legal priorities and rights.  The Debtors are proposing a Five-Year Plan, in which the Debtor is the disbursing agent.  The Plan will be funded from the revenues generated by the Debtor's continued operations.

3.5    Creditors who have been listed on the Debtors' schedules, but have not filed proofs of claim, and have not been listed as "disputed, unliquidated, or contingent," will be paid according to the claim amount listed in the Debtors' schedules, unless the applicable Debtor objects to the claim within the time set forth in the Debtors' plan.

**Article 4**
**Treatment of Claims and Interests**

4.1     *Summary.*  The categories of Claims and Interests set forth below classify all Claims against Debtor for all purposes of this Plan.  A Claim or Interest shall be deemed classified in a particular Class only to the extent the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  The treatment with respect to each Class of Claims and Interests provided for in this Article 5 shall be in full and complete satisfaction, release, and discharge of such Claims and Interests.

4.2     Debtor reserves the right to pay any claim in full at any time in accordance with Debtor's obligation to such Holder under the Plan (i.e., at the percentage distribution designated in the Plan and including any accrued and unpaid interest, if any) without prepayment penalty.  Nothing herein shall be deemed an admission as to the nature, validity, or amount of any claim.  Debtor reserves the right to object to any and all claims whether described in the Plan or not.

4.3     **Class 1: Secured Claim of the BMO Bank, N.A.**

4.3.1 <u>Nature of Claim</u>:  Class 1 consists of the Secured Claim of BMO Bank, N.A. ("**BMO Bank**").  On April 10, 2024, BMO Bank filed proof of claim No. 14-1 asserting a secured claim in the amount of $36,255.12 consisting of: (i) principal in the amount of $34,848.17; (ii) interest in the amount of $1,316.95; (iii) fees of $0.00; and (iv) late charges of $90.00 secured by a lien upon the Debtor's accounts, chattel paper, instruments, documents, general intangibles, letter of credit rights, supporting obligations, deposit accounts, investment property, inventory, equipment, and fixtures.  (the "**BMO Collateral**").  BMO Bank is one of the parties identified in the Order Extending Stay and the claim of BMO Bank is purportedly subject to personal guarantee of Harvey and Lori Reich.

4.3.2.     <u>Treatment</u>: The Debtor believes that the amount of the Class 1 Secured Claim exceeds the value of Debtor's assets which secure it as of the Petition Date.  As of the Petition Date, the Class 1 Secured Claim was secured by (i) funds within depository accounts totaling $2,522.37; accounts receivable with a value of $2,590.97, inventory with a liquidation value of $10,000.00, office furniture and equipment with an aggregate value of $700.00, and other machinery, fixtures, and equipment with a value of $20,000.00.

Holders of Class 1 Claims shall receive the following in exchange for their Class 1 Claims:  The Holder of a Class 1 Claim shall retain its Lien and Security Interest in the Collateral that secured the Class 1 Claim on the Effective Date in the same priority at that time.  The amount, validity, extent, value, and priority of the Class 1 Claim will be determined by the Bankruptcy Court or an agreement between the Debtor and the Holder of the Class 1 Claim.  Except to the extent that the Holder of the Class 1 Claim agrees to less-favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of its Allowed Secured Claim, the Holder of such Allowed Class 1 Claim shall receive the value of its Allowed Secured Claim in full in Cash through thirty six (36) consecutive monthly installments starting in the second quarter of the third year of the Plan

term with interest on this Class 1 Claim set at 6.00% per annum.  The Debtor may accelerate payments on account of Class 1 Claims at its discretion.

Class 1 Claims are subject to the Reich Injunction and Reich Release.

4.3.3     Voting:  The Claim of the Class 1 Creditor is Impaired under the Plan. The Holder of the Class 1 Claim is entitled to vote to accept or reject the Plan.

4.4.    **Class 2: Claim of Amazon Capital Services, Inc.**

4.4.1     Nature of Claim:  Class 2 consists of the Claim against Debtor filed by Amazon Capital Services, Inc. ("**Amazon Capital**").  On April 10, 2024, Amazon Capital filed proof of claim 13-1 asserting a secured claim in the amount of $115,474.10 consisting of: (i) inventory at any time stored for you in Amazon fulfillment centers, wherever found; (ii) any right, title or interest in your Seller Account, as well as any other seller accounts administered by Amazon Services LLC you may use; (iii) all Accounts, Chattel Paper, Deposit Accounts, Documents, Instruments, Investment Property, or Payment Intangibles; (iv) all Equipment, Goods, Inventory and other tangible personal property located in Alaska, Arizona, California, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Maryland, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, Washington, West Virginia, or Wisconsin; (v) any books and records pertaining to the Collateral; and (vi) any insurance, proceeds or products of the foregoing.  (the "**Amazon Collateral**").

4.4.2.     Treatment:  Debtor's assets are fully secured by the first priority lien of BMO Bank as described in more detail in Class 1 of the Plan.  Accordingly, no value exists in any of those assets of Debtor to attach to the Class 2 secured claim after the interests of the secured claim of BMO Bank.  Accordingly, pursuant to 11 U.S.C. § 506(a), the lien of Amazon Capital shall be avoided in its entirety as to all of Debtor's assets as sufficient value does not exist for such lien to attach to the same after the Class 1 secured claim of BMO Bank.

The allowed amount of the Class 2 secured claim shall be $0.00 and the Class 2 secured claim shall continue and attach to the Debtor's assets to the extent of $0.00.  The Class 2 secured claim shall be specifically reclassified as and paid pursuant to Class 9 as a General Unsecured Claim.

The claim of a Class 2 creditor is unimpaired by the Plan; however, a holder of a Class 9 general unsecured claim is impaired and said holder is entitled to vote pursuant to Class 9 of the Plan.

Nothing herein shall constitute an admission as to the nature, validity, or amount of such claims (as to Class 2 or Class 9 or otherwise) and Debtor reserves the right to object to any and all claims.

4.4.3     Voting:  The Secured Claim of the Class 2 Creditor is Unimpaired under the Plan.  The Holder of the Class 2 Claim is not entitled to vote to accept or reject the Plan.

4.5     **Class 3: Claims of Kapitus Servicing Inc.**

4.5.1     <u>Nature of Claim</u>:  Class 3 consists of the Claim of Kapitus Servicing Inc. ("**Kapitus Servicing**")  On February 4, 2024, Kapitus Servicing filed proof of claim No. 1-2 asserting a secured claim in the amount of $349,934.15 consisting of: (i) principal in the amount of $255,870.00; (ii) interest in the amount of $29,068.53; and (iii) fees of $64,995.62 secured by a lien upon the Debtor's accounts, accounts receivable, chattel paper, instruments, inventory, goods, general intangibles, capital stock, cash, and all other assets. (the "**Kapitus Collateral**").  Kapitus Servicing is one of the parties identified in the Order Extending Stay and the claim of Kapitus Servicing is purportedly subject to personal guarantee of Harvey Reich.

4.5.2     <u>Treatment</u>: Debtor's assets are fully secured by the first priority lien of BMO Bank as described in more detail in Class 1 of the Plan.  Accordingly, no value exists in any of those assets of Debtor to attach to the Class 3 secured claim after the interests of the secured claim of BMO Bank.  Accordingly, pursuant to 11 U.S.C. § 506(a), the lien of Kapitus Servicing shall be avoided in its entirety as to all of Debtor's assets as sufficient value does not exist for such lien to attach to the same after the Class 1 secured claim of BMO Bank.

The allowed amount of the Class 3 secured claim shall be $0.00 and the Class 3 secured claim shall continue and attach to the Debtor's assets to the extent of $0.00.  The Class 3 secured claim shall be specifically reclassified as and paid pursuant to Class 9 as a General Unsecured Claim.

The claim of a Class 3 creditor is unimpaired by the Plan; however, a holder of a Class 9 general unsecured claim is impaired and said holder is entitled to vote pursuant to Class 9 of the Plan.

Nothing herein shall constitute an admission as to the nature, validity, or amount of such claims (as to Class 3 or Class 9 or otherwise) and Debtor reserves the right to object to any and all claims.

Class 3 Claims are subject to the Reich Injunction and Reich Release.

4.5.3     Voting:  The Secured Claim of the Class 3 Creditor is Unimpaired under the Plan.  The Holder of the Class 3 Claim is not entitled to vote to accept or reject the Plan.

4.6     **Class 4: Claims of Bankers Healthcare Group**

4.6.1     <u>Nature of Claim</u>:  Class 4 consists of the Claim of Bankers Healthcare Group, LLC ("**Bankers Healthcare**")  On March 29, 2024, Bankers Healthcare filed proof of claim No. 6-3 asserting a secured claim in the amount of $69,091.62 stemming from a

judgment entered in the State of New York, Index No. 004518/2023. Bankers Healthcare is one of the parties identified in the Order Extending Stay and the claim of Bankers Healthcare is purportedly subject to personal guarantee of Harvey and Lori Reich.

4.6.2 <u>Treatment</u>: Debtor's assets are fully secured by the first priority lien of BMO Bank as described in more detail in Class 1 of the Plan. Accordingly, no value exists in any of those assets of Debtor to attach to the Class 4 secured claim after the interests of the secured claim of BMO Bank. Accordingly, pursuant to 11 U.S.C. § 506(a), the lien of Bankers Healthcare shall be avoided in its entirety as to all of Debtor's assets as sufficient value does not exist for such lien to attach to the same after the Class 1 secured claim of BMO Bank.

The allowed amount of the Class 4 secured claim shall be $0.00 and the Class 4 secured claim shall continue and attach to the Debtor's assets to the extent of $0.00. The Class 4 secured claim shall be specifically reclassified as and paid pursuant to Class 9 as a General Unsecured Claim.

The claim of a Class 4 creditor is unimpaired by the Plan; however, a holder of a Class 9 general unsecured claim is impaired and said holder is entitled to vote pursuant to Class 9 of the Plan.

Nothing herein shall constitute an admission as to the nature, validity, or amount of such claims (as to Class 4 or Class 9 or otherwise) and Debtor reserves the right to object to any and all claims.

Class 4 Claims are subject to the Reich Injunction and Reich Release.

4.6.3 Voting: The Claim of the Class 4 Creditor is Unimpaired under the Plan. The Holder of the Class 4 Claim is not entitled to vote to accept or reject the Plan.

4.7 **Class 5: Claims of Cloudfund LLC**

4.7.1 <u>Nature of Claim</u>: Class 5 consists of the Claim of Cloudfund LLC ("**Cloudfund**") arising from the Future Receipts Sale and Purchase Agreement dated September 29, 2022. Pursuant to this agreement, Cloudfund allegedly purchased specified amounts of future payments of Unique Fitness's goods and services, defined as "Future Receipts". As security for the prompt and complete performance of any and all obligations, covenants, and agreements of Unique Fitness under the Agreement, Unique Fitness pledged to Cloudfund a lien upon and security interest in: all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code, now or hereafter owned or acquired by Unique Fitness; and ii. all Unique Fitness's proceeds, as such term is defined by Article 9 of the UCC (the "**Cloudfund Collateral**").

4.7.2 <u>Treatment</u>: Debtor's assets are fully secured by the first priority lien of BMO Bank as described in more detail in Class 1 of the Plan. Accordingly, no value exists in any of those assets of Debtor to attach to the Class 5 secured claim after the interests of the secured claim of BMO Bank. Accordingly, pursuant to 11 U.S.C. § 506(a), the lien of Cloudfund shall be avoided in its entirety as to all of Debtor's assets as sufficient value does not exist for such lien to attach to the same after the Class 1 secured claim of BMO Bank.

The allowed amount of the Class 5 secured claim shall be $0.00 and the Class 5 secured claim shall continue and attach to the Debtor's assets to the extent of $0.00. The Class 5 secured claim shall be specifically reclassified as and paid pursuant to Class 9 as a General Unsecured Claim.

The claim of a Class 5 creditor is unimpaired by the Plan; however, a holder of a Class 9 general unsecured claim is impaired and said holder is entitled to vote pursuant to Class 9 of the Plan.

Nothing herein shall constitute an admission as to the nature, validity, or amount of such claims (as to Class 5 or Class 9 or otherwise) and Debtor reserves the right to object to any and all claims.

4.7.3 Voting: The Claim of the Class 5 Creditor is Unimpaired under the Plan. The Holder of the Class 5 Claim is not entitled to vote to accept or reject the Plan.

## 4.8   **Class 6: Claims of Rocket Capital NY, LLC**

4.8.1 <u>Nature of Claim</u>: Class 6 consists of the Claim of Rocket Capital NY, LLC ("**Rocket Capital**"). On April 10, 2024, Rocket Capital filed proof of claim No. 12-1 asserting a secured claim in the amount of $66,806.78 arising from the Agreement for the Purchase and Sale of Future Receivables dated January 26, 2023. Pursuant to this agreement, Rocket Capital allegedly purchased specified amounts of future payments of Unique Fitness's goods and services, defined as "Future Receivables". As security for the prompt and complete performance of any and all obligations, covenants, and agreements of Unique Fitness under the Agreement, Unique Fitness pledged to Rocket Capital a lien upon and security interest in: All accounts receivable as defined in Article 9 of the Uniform Commercial Code and all proceeds of any account receivable, as the term is defined in Article 9 of the UCC (the "**Rocket Collateral**"). The claim of Rocket Capital is purportedly subject to personal guarantee of Harvey and Lori Reich.

4.8.2 <u>Treatment</u>: Debtor's assets are fully secured by the first priority lien of BMO Bank as described in more detail in Class 1 of the Plan. Accordingly, no value exists in any of those assets of Debtor to attach to the Class 6 secured claim after the interests of the secured claim of BMO Bank. Accordingly, pursuant to 11 U.S.C. § 506(a), the lien of Rocket Capital shall be avoided in its entirety as to all of Debtor's assets as sufficient value does not exist for such lien to attach to the same after the Class 1 secured claim of BMO Bank.

The allowed amount of the Class 6 secured claim shall be $0.00 and the Class 6 secured claim shall continue and attach to the Debtor's assets to the extent of $0.00. The Class 6 secured claim shall be specifically reclassified as and paid pursuant to Class 9 as a General Unsecured Claim.

The claim of a Class 6 creditor is unimpaired by the Plan; however, a holder of a Class 9 general unsecured claim is impaired and said holder is entitled to vote pursuant to Class 9 of the Plan.

Nothing herein shall constitute an admission as to the nature, validity, or amount of such claims (as to Class 6 or Class 9 or otherwise) and Debtor reserves the right to object to any and all claims.

4.8.3     Voting:  The Claim of the Class 6 Creditor is Unimpaired under the Plan. The Holder of the Class 6 Claim is not entitled to vote to accept or reject the Plan.

4.9.    **Class 7: Claim of Fundation Group**

4.9.1     <u>Nature of Claim</u>:  Class 7 consists of the Claim held by Fundation Group ("**Fundation**"), identified on line 2.4 of the Debtor's Schedule D filed February 27, 2024, in the amount of $47,000.00.  Fundation is one of the parties identified in the Order Extending Stay and Harvey Reich is purportedly jointly and severally liable for the Fundation claim against the Debtor.

4.9.2.     <u>Treatment</u>: Debtor's assets are fully secured by the first priority lien of BMO Bank as described in more detail in Class 1 of the Plan.  Accordingly, no value exists in any of those assets of Debtor to attach to the Class 7 secured claim after the interests of the secured claim of BMO Bank.  Accordingly, pursuant to 11 U.S.C. § 506(a), the lien of Fundation shall be avoided in its entirety as to all of Debtor's assets as sufficient value does not exist for such lien to attach to the same after the Class 1 secured claim of BMO Bank.

The allowed amount of the Class 7 secured claim shall be $0.00 and the Class 7 secured claim shall continue and attach to the Debtor's assets to the extent of $0.00.  The Class 7 secured claim shall be specifically reclassified as and paid pursuant to Class 9 as a General Unsecured Claim.

The claim of a Class 7 creditor is unimpaired by the Plan; however, a holder of a Class 9 general unsecured claim is impaired and said holder is entitled to vote pursuant to Class 9 of the Plan.

Nothing herein shall constitute an admission as to the nature, validity, or amount of such claims (as to Class 7 or Class 9 or otherwise) and Debtor reserves the right to object to any and all claims.

Class 7 Claims are subject to the Reich Injunction and Reich Release.

4.9.3     Voting:  The Claim of the Class 7 Creditor is Unimpaired under the Plan. The Holder of the Class 7 Claim is not entitled to vote to accept or reject the Plan.

4.10.   **Class 8: Claim of Goldman Sachs Bank**

4.10.1     <u>Nature of Claim</u>:  Class 8 consists of the Claim held by Goldman Sachs Bank USA ("**Goldman Sachs**"), identified on line 2.5 of the Debtor's Schedule D filed February 27, 2024, in the amount of $125,000.00. On April 10, 2024, Goldman Sachs filed proof of claim 11-2 asserting an unsecured claim in the amount of $130,344.92 arising from a Business Line of Credit.  The claim of Goldman Sachs is purportedly subject to personal guarantee of Lori Reich.

4.10.2.     <u>Treatment</u>: Debtor's assets are fully secured by the first priority lien of BMO Bank as described in more detail in Class 1 of the Plan.  Accordingly, no value exists in any of those assets of Debtor to attach to the Class 8 secured claim after the interests of the secured claim of BMO Bank.  Accordingly, pursuant to 11 U.S.C. § 506(a), the lien of Goldman Sachs shall be avoided in its entirety as to all of Debtor's assets as sufficient value does not exist for such lien to attach to the same after the Class 1 secured claim of BMO Bank.

The allowed amount of the Class 8 secured claim shall be $0.00 and the Class 8 secured claim shall continue and attach to the Debtor's assets to the extent of $0.00.  The Class 8 secured claim shall be specifically reclassified as and paid pursuant to Class 9 as a General Unsecured Claim.

The claim of a Class 8 creditor is unimpaired by the Plan; however, a holder of a Class 9 general unsecured claim is impaired and said holder is entitled to vote pursuant to Class 9 of the Plan.

Nothing herein shall constitute an admission as to the nature, validity, or amount of such claims (as to Class 8 or Class 9 or otherwise) and Debtor reserves the right to object to any and all claims.

Class 8 Claims are subject to the Reich Injunction and Reich Release.

4.10.3     Voting:  The Claim of the Class 8 Creditor is Unimpaired under the Plan. The Holder of the Class 8 Claim is not entitled to vote to accept or reject the Plan.

4.11   **Class 9: General Unsecured Claims**

4.11.1     <u>Nature of Claim</u>:  Class 9 consists of general unsecured claims not otherwise specifically classified in the Plan, including deficiency claims pursuant to 11 U.S.C. §506 and any Allowed rejection damages.

4.11.2     <u>Treatment</u>:  Except to the extent that the Holder of an Allowed General Unsecured Claim agrees to less favorable treatment to such Holder, in exchange for full final

satisfaction, settlement, release and compromise of each Allowed General Unsecured Claim, the Debtor will pay the Holders their pro rata share of the Debtor's disposable income in accordance with the Plan Payment Procedures set forth in Section 4.13 of the Plan.  Debtor discloses that its scheduled unsecured claims and proofs of claim for unsecured claims have been filed as shown on **Exhibit "B"** of this Plan.

Reclassified Class 3, Class 4, Class 6, Class 7, and Class 8 claims shall be subject to the Reich Injunction and Reich Release.

4.11.3    <u>Voting</u>:  Class 9 is Impaired under the Plan.  The Holder of a Class 9 Claim is entitled to vote to accept or reject the Plan.  Nothing herein shall constitute an admission as to the nature, validity, or amount of such claim.  The Debtor reserves the right to object to or seek to subordinate any and all claims.

### 4.12    **Class 10: Interest Claims**

4.12.1    <u>Nature of Claim</u>:  Class 10 consists of the Interest Claims (i.e. the claim of Debtor's sole members based upon ownership of Debtor).  These members are Harvey and Lori Reich who each own 50% of the membership interests of Unique Fitness.

4.12.2    <u>Treatment</u>:  Holders of Allowed Equity Interests shall retain their interests but shall not be entitled to any dividends or other distributions unless and until Allowed Claimants in Classes 1 through 9 receive in full their payments provided under the Plan.

### 4.13    *Plan Payment Procedures*

4.13.1    *"Creditor Payment"* means the disposable income of the debtor to be received in the five-year period beginning on the date that the first payment is due under this Plan, which will be applied to make payments under the Plan.  Projections of the disposable income that will be generated by the Debtor over the life of the Plan are set forth on **Exhibit "C"** attached hereto.

4.13.2    Debtors shall pay the Creditor Payment in satisfaction of its obligations to: (i) its Secured Creditors, (ii) Allowed Administrative Expense Claims, (iii) Allowed Priority Claims and (iv) Class 9 General Unsecured Claims.  The Allowed Secured Claims of BMO Bank, Amazon Capital, Kapitus Servicing, Bankers Healthcare, Cloudfund, Rocket Capital, and Fundation, as set forth in Classes 1 through 7 of the Plan, shall be paid pursuant to the provisions of Class 1 through 7 respectively.  The unsecured portion component of the allowed secured claims of Amazon Capital, Cloudfund, and Fundation shall receive treatment as a Class 9 claim.  This Plan also provides for payment of the priority tax claims in full with interest.  As noted, the aforementioned Plan payments to all creditors (secured, administrative, priority unsecured and general unsecured will be satisfied from Unique Fitness's disposable income, defined in Section 1191(d) of the Bankruptcy Code as income received by Unique Fitness that is not reasonably necessary to be expended for the payment of expenditures necessary for the continuation, preservation, or operation of the business of

the debtor.  In calculating disposable income, Unique Fitness will create and maintain a reserve account no larger than the sum of $10,000.00.  Over the course of the Plan, Unique Fitness is projecting that disposable income will total approximately $170,000.00.

4.13.3    On the fifth business day following each calendar quarter commencing on the first full calendar quarter after the Effective Date and concluding on the first to occur of (a) that date on which all Class 9 Claimants are paid their Allowed Class 9 Claims in full, and (b) the twelfth (12th) full calendar quarter following the Effective Date (the "**Termination Date**"), each allowed Class 9 Claim shall be paid its Pro Rata Share of the Debtor's disposable income from the Plan Payment Account.

4.13.4    The Creditors Payments shall be disbursed as follows:

4.13.4.1    First, in the amount necessary to pay Allowed Administrative Expense Claim until paid in full pro-rata based on a fraction the numerator of which is the particular Allowed Administrative Expense Claim and the denominator of which is all Allowed Administrative Expense Claims.  Debtor anticipates and projects the following administrative claimants: (1) Gensburg Calandriello & Kanter, P.C. as counsel to the Debtors and (2) Robert P. Handler as Subchapter V Trustee.  Provided that the Plan is confirmed under 11 U.S.C. §1191(a), the Allowed Administrative Expense Claim of Robert P. Handler, Subchapter V Trustee will be paid on the later of (i) the Effective Date and (ii) the date that is 60 days after the entry of an order of this Court approving Robert P. Handler's fee application, or as agreed to by the Debtor and Robert P. Handler.

4.13.4.2    Upon payment in full of the Allowed Administrative Expense Claims, the Creditor Payments shall be distributed to the Holders of Allowed Priority Claims, including holders of Priority Tax Claims, pro-rata based on a fraction the numerator of which is the particular Allowed Priority Claim and the denominator of which is all Allowed Priority Claims.  In the event an asserted Priority Claim is subject to dispute pursuant to an objection to claim, is based on an estimated liability, or is based on a liability under audit or other non-final matters, Debtor will commence payments to such Holder based on the asserted Priority Claim (except as otherwise ordered by the Court) provided that if it is determined by this Court or any other tribunal of competent jurisdiction that the holder of a Priority Claim has been overpaid for its Priority Claim, then such Holder shall return such overpayment within 15 days of notice by Debtor so that Debtor may reallocate such disbursement in accordance with the priorities of the Plan, and such Holder shall be specifically barred and forbidden from applying such payment to any other indebtedness, including any post-Confirmation or general unsecured indebtedness.  Nothing shall bar Debtor from seeking an offer in compromise or alternate payment arrangements with any holder of an Allowed Priority Tax Claim and Debtor may use the disbursement to which said Holder would be entitled to satisfy the same.  For the avoidance of doubt, any Allowed Priority Tax Claim will be paid in full by the 5-year anniversary of the Filing Date.

4.13.4.3    Upon payment in full of all Allowed Administrative Claims and in conjunction with the installment payments made on Allowed Priority Tax Claims, which

installments, in any given period, shall be paid prior to payments on Allowed General Unsecured Claims, Debtor shall commence distributions of the Creditor Payments to holders of General Unsecured Claims pro-rata based on a fraction the numerator of which is the particular Allowed General Unsecured Claim and the denominator of which is all Allowed General Unsecured Claims.  In the event an asserted General Unsecured Claim is subject to dispute pursuant to an objection to claim, is based on an estimated liability, or other non-final matters, Debtor will escrow payments to such Holder based on the disputed portion of the asserted General Unsecured Claim in a segregated bank account for payment to such Holder to the extent the Holder prevails, provided that to the extent the Debtor is determined to prevail by this Court or any other tribunal of competent jurisdiction Debtor may reallocate such escrowed disbursement in accordance with the priorities of the Plan.

4.13.4.4     The Debtor shall maintain a standard system of accounting in accordance with generally accepted accounting principles.  The Debtor will prepare quarterly post-confirmation operating reports (conforming with the Debtor's calendar quarters) identical in form to the monthly operating reports referred to in the United States Trustee's Chapter 11 Operating Instructions and Reporting Requirements.  The initial report prepared by the Debtor shall cover the period from the Confirmation Date to the Effective Date.  The quarterly operating reports must be dated and signed, certifying their accuracy, by a principal officer of the Debtor.  Copies of the reports shall be forwarded to each holder of an Allowed Class Claim who, in writing, requests same from the Debtor or Debtor's attorneys.  The quarterly operating reports shall be submitted no later than the fifteenth day of the month following the reported quarter.

4.14   *Elimination of Vacant Classes.*  Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies Section 1128(a)(8) of the Bankruptcy Code with respect to that Class.

## Article 5
## Subchapter V Trustee

5.1   *Subchapter V Trustee.* The Subchapter V Trustee was appointed by the United States Trustee in this case to perform the duties described in section 1183(b) of the Bankruptcy Code, one of which is to facilitate the development of a consensual plan of reorganization.

5.2   *Termination of the Subchapter V Trustee's Services.* The services of the Subchapter V Trustee shall terminate upon "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code.  Debtor shall directly make all payments required under this Plan, including the first payments required for substantial consummation of the Plan.

5.3     *Compensation of the Subchapter V Trustee.*  The Subchapter V Trustee shall be entitled to apply for reasonable compensation for the Subchapter V Trustee's fees and expenses under 11 U.S.C. §§ 330 and 503(b)(3) periodically following confirmation of the Plan in accordance with the Plan.

Debtor shall pay all compensation awarded the Subchapter V Trustee on the Effective Date if confirmation is consensual and in accordance with the Plan Payment Procedures in Section 4.8.4.1 of this Plan if confirmation is by cramdown.


## Article 6
## Treatment of Unclassified Claims

6.1     *Summary.*  In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified in the Plan. The treatment accorded to Administrative Expense Claims and Priority Tax Claims is set forth below in this Article 6.

6.2     *Administrative Claims.*  Except as otherwise provided, each Holder of an Allowed Administrative Expense Claim (including Allowed Administrative Expense Claims of Professionals) shall be paid (a) on the Effective Date, an amount, in Cash, by the Debtor equal to the Allowed Amount of its Administrative Expense Claim, in accordance with Section 1129(a)(9)(A) of the Bankruptcy Code, or (b) under such other terms as may be mutually agreed upon by both the Holder of such Allowed Administrative Expense Claim and the Debtor, or (c) as otherwise ordered by a Final Order of the Bankruptcy Court.

6.3     *Application for an Allowed Administrative Expense Claim.*  Except as otherwise provided in this Plan, any Person holding an Administrative Expense Claim, including any Person seeking an award of Professional Compensation, shall file an application for allowance of such Administrative Expense Claim (or in the case of professional fees, a final application) with the Bankruptcy Court within forty-five (45) days after the Confirmation Date, or by such other deadline as may be fixed by the Bankruptcy Court prior to such deadline.  At the same time any Person files an Administrative Expense Claim, such Person shall also serve a copy of the application for Administrative Expense Claim upon counsel for Debtor and the Subchapter V Trustee.  Any Person who fails to timely file and serve an application for allowance of an Administrative Expense Claim shall be forever barred from seeking payment of such Administrative Expense Claims by Debtor or the Estate.   Notwithstanding the above, Administrative Expense Claims representing obligations incurred by Debtor in the ordinary course of business after the Filing Date, such as to post-petition vendors or employees, will be deemed Allowed without the need of filing an application and shall be paid or performed by Debtor when due in accordance with the terms and conditions of the particular agreements or non-bankruptcy law governing such obligations.  Debtor is paying post-petition bills and does not expect any claims for unpaid post-petition goods and services other than possible professional fees.

6.4 *Allowed Administrative Expense Claims.* Subject to the provisions of Sections 328, 330(a) and 331 of the Bankruptcy Code, each holder of an Allowed Administrative Expense Claim (unless otherwise provide herein) will be paid the full unpaid amount of such Allowed Administrative Expense Claim in Cash pursuant to Section 4.13 of this Plan.

6.5 *Post-Confirmation Professional Fees.* Debtor may pay professional fees incurred after confirmation of the Plan without Court approval, other than the fees of the Subchapter V Trustee, which must be approved by the Court.

6.6 *Priority Tax Claims.* Each Holder of an Allowed Priority Tax Claim shall receive from the Debtor, on account of such Allowed Priority Tax Claim, at the election of the Debtor, either payment on the Effective Date, or regular installment payments in Cash beginning on the Effective Date in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code. If the distribution is made through regular installments, Holders of Allowed Priority Tax Claims shall receive interest on account of their Allowed Priority Tax Claims at the rate established for delinquent tax obligations pursuant to 26 U.S.C. §6621; provided, however, that if the Holder of such Allowed Priority Tax Claim is a city, county or state, such Holder shall receive interest on account of its Allowed Priority Tax Claim at the applicable statutory rate under state law. Notwithstanding the above, each Holder of an Allowed Priority Tax Claim may be paid (i) under such other terms as may be mutually agreed upon by both the Holder of such Allowed Priority Tax Claim and the Debtor, or (b) as otherwise ordered by a Final Order of the Bankruptcy Court.

## Article 7
## Means for the Implementation of the Plan

7.1 *Parties Responsible for Implementation of the Plan.* Upon confirmation, Debtor will be charged with administration of the Case. Debtor will be authorized and empowered to take such actions as are required to effectuate the Plan. Debtor will file all post-confirmation reports required by the Bankruptcy Code and Bankruptcy Rules. Debtor will also file the necessary final reports and may apply for a final decree after substantial consummation at such time as debtor deems appropriate unless otherwise required by the Bankruptcy Court. Debtor shall be authorized to reopen this case after the entry of a Final Decree to enforce the terms of the Plan including for the purpose of seeking to hold a party in contempt or to enforce the confirmation or discharge injunction or otherwise afford relief to Debtor and Debtor may request that the fee associated with such motion to reopen Debtor's case be waived.

7.2 *Sources of Cash for Distribution.*

7.2.1 The source of funds for the payments pursuant to the Plan is Debtor's continued operations.

7.2.2 A copy of Debtor's post Confirmation monthly projections is set forth on **Exhibit "C"** to this Plan. Debtor's projections are based on Debtor's post-petition operations and expected future operations. Debtor is able to reasonably project income and expenses based on such information. To the extent that Debtor's gross revenue varies from the projected gross

revenue, Debtor anticipates a corresponding and proportional decrease in Debtor's expenses such that Debtor will be able to maintain all Distributions under this Plan.

7.2.3    Debtor may maintain bank accounts under the confirmed Plan in the ordinary course of business.  Debtor may also pay ordinary and necessary expenses of administration of the Plan in due course.

7.3      *Preservation of Causes of Action*.  In accordance with section 1123(b)(3) of the Bankruptcy Code, Debtor will retain and may (but is not required to) enforce all Causes of Actions.  After the Effective Date, Debtor, in its sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Causes of Actions (or decline to do any of the foregoing), without further approval of the Bankruptcy Court.  Debtor (or any successors, in the exercise of their sole discretion), may pursue such Causes of Actions so long as it is the best interests of Debtor (or any successors holding such rights of action).  The failure of Debtor to specifically list any claim, right of action, suit, proceeding or other Causes of Action in this Plan does not, and will not be deemed to, constitute a waiver or release by Debtor of such claim, right of action, suit, proceeding or other Causes of Action, and Debtor will retain the right to pursue such claims, rights of action, suits, proceedings and other Causes of Actions in Debtor's sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit, proceeding or other Causes of Actions upon or after the confirmation or consummation of this Plan.  Debtor reserves all causes of actions for breach of any former or now existing agreement or otherwise.  Debtor specifically reserves any cause of action against any of Debtor's account debtors related to underpayment or non-payment of any invoices, or other monies or receivables due.  The Plan shall not be deemed a waiver of any right of Debtor to collect any receivable or right to payment under any applicable laws.  Debtor expressly reserves the right to exercise any and all remedies available to Debtor regarding its accounts receivable or rights to payment at law or in equity, at such time or times as Debtor from time to time may elect.  This Plan is filed with a full reservation of rights.  Any failure by Debtor to assert or set forth the occurrence of any other default or events of default which may have occurred shall not be deemed to be a waiver, release or estoppel of such other default or event of default.  Debtor hereby expressly reserves the right to declare any such other default or event of default and to take such other action as Debtor may be entitled to applicable law.  No delay on the part of Debtor in exercising any right or remedy shall operate as a waiver in whole or in part of any right or remedy. Without waiver of the generality of the forgoing, Debtor specifically retains and does not waive any rights, claims, defenses and objections to any tax claim, including without limitation regarding any audit whether commenced before or after the Confirmation Date

7.4      *Effectuating Documents, Further Transactions*.  Debtor is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such action as may be necessary, desirable or appropriate to effectuate and further evidence the terms and conditions of this Plan or to otherwise comply with applicable law.

7.5      *Exemption from Certain Transfer Taxes and Recording Fees*.  Pursuant to 11 U.S.C. § 1146(a) and any other applicable laws, codes or regulations, any transfers from Debtor

to any other Person or entity pursuant to or in contemplation of this Plan, or any agreement regarding the transfer of title to or ownership of any of Debtor's personal property will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment. Without limitation of the foregoing, the Confirmation Order may direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

7.6    *Further Authorization*.  Debtor shall be entitled to seek such orders, judgments, injunctions and rulings as it deems necessary or desirable to carry out the intentions and purposes of, and to give full effect to the provisions of, this Plan.

7.7    *Liabilities of Debtor*.  Debtor will not have any liabilities except those expressly stated or assumed under the Plan.  Debtor will be responsible for all expenses incurred by Debtor in the ordinary course of business after the Filing Date, and those expenses will be paid in the ordinary course of business as they become due or as agreed upon by holders of the expense claim.

## Article 8
## Distributions

8.1    *Disbursing Agent*.  Unless otherwise provided for herein, all Distributions under this Plan shall be made by Debtor or its agent.

8.2    *Distributions of Cash*.  Any Distribution of Cash made by Debtor pursuant to this Plan shall, at Debtor's option, be made by check drawn on a domestic bank or by wire transfer from a domestic bank or in any other form of cash or cash equivalent.

8.3    *No Interest, Fees, Costs or Attorney Fees on Claims or Interests*.  Unless otherwise specifically provided for in this Plan, the Confirmation Order, or a Postpetition agreement in writing between the Debtor and a Holder, Postpetition interest, fees, costs or attorney fees shall not accrue or be paid on Claims, and no Holder shall be entitled to interest, fees, costs or attorney fees accruing on or after the Filing Date through and including the Effective Date on any Claim or after the Effective Date unless specifically provided for in the Plan.  Additionally, and without limiting the foregoing, interest, fees, costs and attorney fees shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final determination is made when and if such Disputed Claim becomes an Allowed Claim.  The provisions of the section of the Plan shall include and pertain to, without limitation, any such claim for post-petition interest, fees, costs or attorney fees pursuant to 11 U.S.C. §§ 503, 506 or 507 if no such claim was allowed prior to the Confirmation Date.

8.4    *Delivery of Distributions*.  The Distribution to a Holder of an Allowed Claim shall be made by Debtor (a) at the address set forth on the proof of claim filed by such Holder, (b) at the address set forth in any written notices of address change delivered to Debtor after the date of

any related proof of claim, (c) at the addresses reflected in the Schedules if no proof of claim has been filed and Debtor has not received a written notice of a change of address, or (d) if the Holder's address is not listed in the Schedules, at the last known address of such Holder according to the Debtor's books and records.  If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until Debtor is notified by such Holder in writing of such Holder's then-current address, at which time Debtor shall recommence Distributions to such Holder without interest but further provided that (i) any distributions not claimed within 6 months of return shall be irrevocably retained by Debtor notwithstanding any federal or state escheat laws to the contrary and (ii) such Holder shall waive its right to such Distributions.

8.5     *Distributions to Holders as of the Record Date*.  All Distributions on Allowed Claims shall be made to the Record Holders of such Claims.  As of the close of business on the Record Date, the Claims register maintained by the Bankruptcy Court shall be closed, and there shall be no further change in the Record Holder of any Claim.  Debtor shall have no obligation to recognize any transfer of any Claim occurring after the Record Date.  Debtor shall instead be entitled to recognize and deal for all purposes under this Plan with the Record Holders as of the Record Date.

8.6     *Fractional Dollars*.  Any other provision of this Plan notwithstanding, the Debtor shall not be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under this Plan would otherwise be called for, at Debtor's option the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

8.7     *Withholding Taxes*.  Debtor shall make reasonable efforts to comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under this Plan shall be subject to any such withholding and reporting requirements.

## Article 9
## Procedures for Treating and Resolving Disputed Claims

9.1     *Objections to Claims*.  Debtor shall be entitled to object to Claims, provided, however, that Debtor shall not be entitled to object to Claims (i) that have been Allowed by a Final Order entered by the Bankruptcy Court prior to the Effective Date, or (ii) that are Allowed by the express terms of this Plan.  This Court will retain jurisdiction with respect to any claim disputes pursuant to subsequently filed claim objections or adversary proceedings (collectively, the "Claim Disputes") initiated before or after the entry of the Final Decree.

9.2     *No Distributions Pending Allowance*.  Except as otherwise provided in the Plan, no Distributions will be made with respect to any portion of a Claim unless and until (i) no objection to such Claim has been filed, or (ii) any objection to such Claim has been settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court.

9.3    *Resolution of Claims Objections*.   On and after the Confirmation Date, Debtor shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Claims without approval of the Bankruptcy Court.

**Article 10**
**Provision for Assumption of Unexpired**
**Leases and Executory Contracts**

10.1    *Provisions Regarding Executory Contracts.*

10.1.1    Any unexpired leases or executory contracts which are not assumed under the Plan or are the subject of a pending motion to assume as of the Effective Date shall be deemed rejected pursuant to Section 365 of the Bankruptcy Code on the Effective Date. Under the terms of the Plan, a proof of claim for damages arising from such rejection must be filed in compliance with the Bankruptcy Rules on or before thirty (30) days after the Effective Date.  Any claims which are not timely filed will be disallowed and discharged. Any Allowed Claim for rejection damages will be treated and paid as a Class 4 General Unsecured Claim.  Notwithstanding anything to the contrary stated herein, Debtor will be deemed to have assumed all executory contracts regarding insurance, including liability and property insurance and claims incurred coverage or similar coverage, real and personal property insurance, vehicle insurance, business liability, and professional liability insurance.

10.1.2    Debtor may reject any Assumed Contract after its assumption in accordance with 11 U.S.C. § 365(g).

**Article 11**
**Effect of Plan on Claims and Interests**

11.1    *Vesting of Debtor's Assets*.   Except as otherwise explicitly provided in the Plan, upon the Court's entry of the Confirmation Order, all property comprising the Estate (including Retained Actions, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall revest in Debtor free and clear of all Claims, Liens, charges, encumbrances, rights and Interests of creditors and equity security holders, except as specifically provided in the Plan.  As of the earlier of the Effective Date and the entry of a Final Decree, Debtor may operate its business and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and Confirmation Order.

11.2    *Discharge of Debtor.*

11.2.1    <u>Discharge if Plan Confirmed Under Section 1191(a)</u>.  In the event the Plan is confirmed under Section 1191(a), the Debtor shall receive a discharge as provided for under Section 1141(d) upon the Confirmation Date.  Without limitation of such discharge but in addition thereto, the Distributions and rights that are provided in the Plan shall be in

complete satisfaction, discharge, and release of all Claims and Causes of Action against Debtor, whether known or unknown, including any and all liabilities of Debtor, Liens on Debtor's assets, obligations of Debtor, rights against Debtor, and Interests in Debtor or its Estate that arose prior to the Effective Date regardless of whether a claimant accepted or rejected the Plan.

11.2.2    Discharge if Plan Confirmed Under Section 1191(b). If the Plan is confirmed under section 1191(b), as soon as practicable after completion by the Debtor of all payments expressly provided for under this Plan due within five (5) years of the Effective Date, the Court shall grant Debtor a discharge.  The Distributions and rights that are provided in the Plan shall be in complete satisfaction and release of all Claims and Causes of Action against Debtor, whether known or unknown, including any and all liabilities of Debtor, Liens on Debtor's assets, obligations of Debtor, rights against Debtor, and Interests in Debtor or its Estate that arose prior to the Effective Date regardless of whether a claimant accepted or rejected the Plan.

11.3    *Setoffs*. Debtor may, but shall not be required to, set off or recoup against any Claim, and the payments or other Distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever that Debtor may have now or in the future against such Holder; but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by Debtor of any such claim that Debtor may have against such Holder.

11.4    *Injunction*.  THE CONFIRMATION ORDER SHALL ACT AS A PERMANENT INJUNCTION AGAINST ANY PERSON: (a) COMMENCING OR CONTINUING ANY ACTION, (b) EMPLOYING ANY PROCESS, OR (c) ANY ACTING TO COLLECT, OFFSET, OR RECOVER ANY CLAIM EXCEPT AS PROVIDED FOR IN THIS PLAN AGAINST: (1) DEBTOR, OR (2) AGAINST ANY PROPERTY OF DEBTOR.  SUCH INJUNCTION SHALL SURVIVE THE CLOSURE OF THE BANKRUPTCY CASE AND THIS COURT SHALL RETAIN JURISDICTION TO ENFORCE SUCH INJUNCTION.

11.5    ***Discharge of Third Parties***.  For the avoidance of doubt, nothing in the Plan is intended to be or shall be deemed a discharge, release, waiver or limitation of any rights, remedies, or claims of any claimants or other parties in interest against any non-Debtor parties, including any non-Debtor parties co-liable with the Debtor on a Claim.

NOTWITHSTANDING THE FOREGOING, UNDER THE PLAN AND PURSUANT TO THE CONFIRMATION ORDER, IN CONSIDERATION OF AND ON ACCOUNT OF THE INJUNCTION CONTRIBUTION AND THE AGREEMENT TO SUBORDINATE IN RIGHT OF PAYMENT ALL OF THE INSIDER CLAIMS, HARVEY AND LORI REICH SHALL RECEIVE THE REICH RELEASE OF ALL CLAIMS, JUDGMENTS, CAUSES OF ACTION HELD BY THE ENJOINED PARTIES, THEIR ASSIGNS AND SUCCESSORS, AGAINST HARVEY AND/OR LORI REICH. THE REICH RELEASE SHALL BE CONDITIONED UPON: (i) THE CONFIRMATION OF THE PLAN; (ii) COMPLETION OF ALL INJUNCTION CONTRIBUTIONS AND (iii) THE SUBORDINATION IN RIGHT OF PAYMENT OF ANY ALLOWED INSIDER CLAIMS.

11.6 *Exculpation*. TO THE EXTENT PERMISSIBLE UNDER BANKRUPTCY CODE §1125(e), NEITHER THE DEBTOR, NOR ITS RETAINED ADVISORS, ACCOUNTANTS, AND ATTORNEYS, NOR THE SUBCHAPTER V TRUSTEE SHALL HAVE OR INCUR ANY LIABILITY TO ANY HOLDER OF A CLAIM OR INTEREST FOR ANY ACT OR OMISSION DURING THE PENDENCY OF THE CHAPTER 11 CASE IN CONNECTION WITH, OR ARISING OUT OF, THE CHAPTER 11 CASE, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE CONSUMMATION OF THE PLAN, OR THE PROPERTY OR CASH TO BE DISTRIBUTED UNDER THE PLAN; PROVIDED, HOWEVER, THAT THE FOREGOING EXCULPATION SHALL HAVE NO EFFECT ON THE LIABILITY OF AN ENTITY WHICH RESULTS FROM ANY SUCH ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE RESULTED FROM GROSS NEGLIGENCE, WILLFUL MISCONDUCT, BREACH OF FIDUCIARY DUTY, CRIMINAL CONDUCT, ULTRA VIRES ACTIONS, OR THE DISCLOSURE OF CONFIDENTIAL INFORMATION THAT CAUSES DAMAGES, AND, IN ALL RESPECTS, THE DEBTOR AND ITS OFFICER SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN. IN ADDITION, THE EXCULPATION PROVIDED FOR IN THE PLAN SHALL NOT RELEASE ANY ATTORNEY FROM ANY OBLIGATIONS OWED UNDERTHE ILLINOIS RULES OF PROFESSIONAL CONDUCT FOR MALPRACTICE LIABILITY.

11.7 *Effect of Confirmation*.

11.7.1 <u>Binding Effect</u>. On the Confirmation Date, the provisions of this Plan shall be binding on Debtor, the Estate, all Holders of Claims against or Interests in Debtor, and all other parties-in-interest whether or not such Holders are Impaired and whether or not such Holders have accepted this Plan. Creditors shall have no right to enforce a Claim against Debtor, even following a default under the Plan, except to the extent and amount that any Claim of such creditor is provided for and then due under the Plan.

11.7.2 <u>Filing of Reports</u>. Debtor shall file all reports required by the Bankruptcy Code and Bankruptcy Rules.

11.7.3 <u>Post-Effective Date Retention of Professionals</u>. Upon the Effective Date, any requirement that professionals comply with §§ 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and Debtor will employ and pay professionals in their ordinary course of business provided all such requirements for Court approval of fees will continue to apply to the Subchapter V Trustee.

**Article 12**
**Retention and Scope of Jurisdiction of the Bankruptcy Court**

13.1 *Retention of Jurisdiction*. Subsequent to the Effective Date, the Bankruptcy Court shall have or retain jurisdiction for the following purposes:

13.1.1  To adjudicate objections concerning the allowance, priority or classification of Claims and any subordination thereof, and to establish a date or dates by which objections to Claims must be filed to the extent not established herein;

13.1.2  To liquidate the amount of any disputed, contingent or unliquidated Claim, to estimate the amount of any disputed, contingent or unliquidated Claim, to establish the amount of any reserve required to be withheld from any distribution under this Plan on account of any disputed, contingent or unliquidated Claim;

13.1.3  To resolve all matters related to the rejection, and assumption and/or assignment of any Executory Contract or Unexpired Lease of Debtor;

13.1.4  To hear and rule upon all Retained Actions, Avoidance Actions and other Causes of Action commenced and/or pursued by Debtor[3];

13.1.5  To hear and rule upon all applications for Professional Compensation, including the Subchapter V Trustee;

13.1.6  To remedy any defect or omission or reconcile any inconsistency in this Plan, as may be necessary to carry out the intent and purpose of this Plan;

13.1.7  To construe or interpret any provisions in this Plan and to issue such orders as may be necessary for the implementation, execution and consummation of this Plan, to the extent authorized by the Bankruptcy Court;

13.1.8  To adjudicate controversies arising out of the administration of the Estates or the implementation of this Plan;

13.1.9  To make such determinations and enter such orders as may be necessary to effectuate all the terms and conditions of this Plan, including the Distribution of funds from the Estate and the payment of claims;

13.1.10 To determine any suit or proceeding brought by Debtor to recover property under any provisions of the Bankruptcy Code;

13.1.11 To hear and determine any tax disputes concerning Debtor and to determine and declare any tax effects under this Plan;

13.1.12 To determine such other matters as may be provided for in this Plan or the Confirmation Order or as may be authorized by or under the provisions of the Bankruptcy Code;

---

[3] Notwithstanding anything to the contrary in the Plan, Debtor shall be authorized to file any Retained Action related to the collection of accounts receivable or otherwise in any state or local court with jurisdiction under applicable state law.

13.1.13 To determine any controversies, actions or disputes that may arise under the provisions of this Plan, or the rights, duties or obligations of any Person under the provisions of this Plan;

13.1.14  To enter a final decree;

13.1.15 To enter an order of discharge; and

13.1.16 To enforce and interpret any order or injunctions entered in this Bankruptcy Case.

13.2   *Alternative Jurisdiction*.  In the event that the Bankruptcy Court is found to lack jurisdiction to resolve any matter, then the District Court shall hear and determine such matter. If the District Court does not have jurisdiction, then the matter may be brought before any court having jurisdiction with regard thereto.  Notwithstanding anything to the contrary herein, Debtor shall be authorized to bring any action related to a lease, contract or account (including any account receivable due to Debtor) to which Debtor is a party in any state or local court having jurisdiction over such action.

13.3   *Final Decree*.  If the Plan is confirmed, the Bankruptcy Court may, upon application of Debtor, at any time after "substantial consummation" of the Plan as defined in section 1101(2) of the Bankruptcy Code, enter a final decree in the case, notwithstanding the fact that additional funds may eventually be distributed to parties in interest.  In such event, the Bankruptcy Court may enter an Order closing this case pursuant to Section 350 of the Bankruptcy Code, provided, however, that: (a) Debtor shall continue to have the rights, powers, and duties set forth in this Plan; and (b) the Bankruptcy Court may from time to time reopen the Bankruptcy Case if appropriate under applicable law.  Any fee associated with a motion to reopen this Bankruptcy Case (if necessary) may be waived upon order of the Court.

## Article 14
## Miscellaneous Provisions

14.1   *Modification of the Plan*.  Debtor shall be allowed to modify this Plan pursuant to section 1193 of the Bankruptcy Code to the extent applicable law permits.

14.2   *Pre-Confirmation Modifications.* Debtor may modify the Plan at any time before the Confirmation Hearing by filing the modification with the Court.

14.3   *Modification After Confirmation and Prior to Substantial Consummation.* Debtor may modify the Plan upon a showing that circumstances warrant such a modification and after a notice and hearing.  If the Plan was confirmed under section 1191(a), any holder of a claim or interest that has accepted or rejected the Plan is deemed to have accepted or rejected, as the case may be, the plan as modified, unless, within the time fixed by the Court, such holder changes its previous acceptance or rejection.

14.4   *Modification After Substantial Consummation.* If the Plan has been confirmed under section 1191(b), Debtor may modify the Plan upon a showing that the circumstances warrant such a modification and after a notice and hearing.

14.5   *Force Majeure.* Without limitation of any other provisions of the Plan, the laws of force majeure shall apply to the Plan and Debtor's compliance with the Plan. Any Person with obligation under this Plan will not be required to perform any obligation under this Plan or be liable for damages to any other Person to whom performance is otherwise owed under this Plan so long as the performance or non-performance of the obligation is delayed, caused, or prevented by a force majeure. A "force majeure" is defined as hurricanes, earthquakes, floods, fire (or any substantial natural event), pandemics, laws, orders of government, and any other cause not reasonably within the control of such Person with obligations under the Plan and which by the exercise of due diligence the non-performing Party is unable in whole or in part to prevent or overcome. All time periods for such performance will be extended for the period that the force majeure is in place. Debtor further expressly reserves the right to modify this Plan pursuant to Article 14 of the Plan upon the occurrence of a force majeure. Debtor shall retain the right to reopen this Bankruptcy Case and seek other relief pursuant to 11 U.S.C. §305(a) for any reason, so long as the Bankruptcy Court finds that such relief is in the interests of creditors and the debtor.

14.6   *Allocation of Plan Distributions Between Principal and Interest*. To the extent that any Allowed Claim entitled to a Distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

14.7   *Applicable Law*. Except to the extent that the Bankruptcy Code or the Bankruptcy Rules are applicable, the rights and obligations arising under this Plan shall be governed by the laws of the State of Illinois, without regard to application of any principles of law respecting conflicts of law.

14.8   *Preparation of Estate Returns and Resolution of Tax Claims*. Debtor shall file all tax returns and other filings with governmental authorities and may file determination requests under Section 505(b) of the Bankruptcy Code to resolve any Disputed Claim relating to taxes with a governmental authority.

14.9   *Headings*. The headings of the Articles and the sections of this Plan have been used for convenience only and shall not limit or otherwise affect the meaning thereof.

14.10   *Revocation of Plan*. Debtor reserves the right, unilaterally and unconditionally, to revoke and/or withdraw this Plan at any time prior to entry of the Confirmation Order, and upon such revocation and/or withdrawal this Plan shall be deemed null and void and of no force and effect.

14.11  *No Admissions; Objection to Claims*.  Nothing in this Plan shall be deemed to constitute an admission that any individual, corporation, partnership, trust, venture, governmental unit, or any other form of legal entity or person as being the Holder of a Claim is the Holder of an Allowed Claim, except as expressly provided in this Plan.  The failure of Debtor to object to or examine any Claim for purposes of voting shall not be deemed a waiver of Debtor's rights to object to or reexamine such Claim in whole or in part.

14.12  *No Bar to Suits*.  Except as otherwise provided in Article 11 of this Plan, neither this Plan or confirmation hereof shall operate to bar or estop Debtor from commencing any Cause of Action, or any other legal action against any Holder of a Claim or any individual, corporation, partnership, trust, venture, governmental unit, or any other form of legal entity, whether such Cause of Action, or any other legal action arose prior to or after the Confirmation Date and whether or not the existence of such Cause of Action, or any other legal action was disclosed in any document filed by Debtor in connection with this Bankruptcy Case or whether or not any payment was made or is made on account of any Claim.  Without limitation, Debtor retains and reserves the right to prosecute Retained Actions.

14.13  *Exhibits/Schedules*.  All exhibits and schedules to this Plan, and all attachments thereto, are incorporated into and are a part of this Plan as if set forth in full herein.

## Article 15
## Tax Consequences

Tax consequences resulting from confirmation of the Plan can vary greatly among the various Classes of Creditors and Holders of Interests, or within each Class.  Significant tax consequences may occur as a result of confirmation of the Plan under the Internal Revenue Code and pursuant to state, local, and foreign tax statutes.  Because of the various tax issues involved, the differences in the nature of the Claims of various Creditors, the taxpayer status and methods of accounting and prior actions taken by Creditors with respect to their Claims, as well as the possibility that events subsequent to the date hereof could change the tax consequences, this discussion is intended to be general in nature only.  No specific tax consequences to any Creditor or Holders of an Interest are represented, implied, or warranted.  Each Holder of a Claim or Interest should seek professional tax advice, including the evaluation of recently enacted or pending legislation, because recent changes in taxation may be complex and lack authoritative interpretation.  The Debtor assumes no responsibility for the tax effect that consummation of the Plan will have on any given Holder of a Claim or Interest.  Holders of Claims or Interest are strongly urged to consult their own tax advisors covering the federal, state, local and foreign tax consequences of the Plan to their individual situation.

## Article 16
## Liquidation Analysis

16.1  *Liquidation Analysis.*

### 16.1.1 "Best Interests" Test.

Pursuant to Section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court must find that the Plan is in the best interests of Creditors (commonly referred to as the "Best Interests" test). To satisfy the "Best Interests" test, the Bankruptcy Court must determine that each Holder of an Impaired Claim either: (i) has accepted the applicable Plan; or (ii) will receive or retain under the applicable Plan money or other property which, as of the Effective Date, has a value not less than the amount such Holder would receive if the Debtor's property was liquidated under Chapter 7 of the Bankruptcy Code on that date.

### 16.1.2 Costs and Expenses of Liquidation.

In Chapter 7 liquidation, a trustee in bankruptcy would be appointed. Unique Fitness's business likely would not be operated by the Chapter 7 trustee, and the trustee would likely liquidate the Unique Fitness's assets on a piecemeal basis. The net amount generated from the liquidation of Unique Fitness's remaining assets would be reduced by the administrative expenses of both the Chapter 7 case and this Bankruptcy Case, including the fees and commissions of the Chapter 7 trustee, as well as those of counsel and other professionals that might be retained by the Chapter 7 trustee, in addition to unpaid expenses incurred by Unique Fitness's during the Bankruptcy Case. These expenses and costs would reduce the net proceeds available to Holders of Allowed Claims or Allowed Equity Interests.

Any remaining net cash would be allocated to creditors and stockholders in strict accordance with the priorities set forth in Section 726 of the Bankruptcy Code. The present value of such allocation of the hypothetical liquidation proceeds (after deducting the amounts described above) is then compared with the present value of the proposed Distributions under Unique Fitness's Plan to each of the Classes of Claims and Equity Interests to determine if Unique Fitness's Plan is in the best interests of each Creditor or Holder of an Equity Interest. If the present value of the Distributions available to unsecured creditors under the hypothetical liquidation is less than or equal to the present value of the Distributions available to unsecured creditors under Unique Fitness's Plan, then Unique Fitness's Plan is in the best interests of creditors and can be considered in the "best interests of creditors" by the Bankruptcy Court.

### 16.1.3 The Plan Meets the Best Interests Test:

Unique Fitness believes that its Plan will produce a recovery for Holders of Claims and Equity Interests that would be substantially better than would be achieved in Chapter 7 liquidation. A formal liquidation analysis is attached hereto as **Exhibit D**. The liquidation of Unique Fitness's assets under Chapter 7 would entail the appointment of a Chapter 7 trustee who would not have familiarity with the case and who likely would not run Unique Fitness's business to facilitate a going concern value, or to generate disposable income to distribute to Creditors, as will occur under Unique Fitness's Plan. Unique Fitness owns no real estate and believes the fair market value of its tangible and intangible assets as of the Petition Date was approximately $35,813.34. Of this amount, $2,522.37 encompassed bank account deposits, $2,590.97 represented accounts receivable, and $30,000 represented inventory and other machinery, fixtures, and equipment.

Moreover, a Chapter 7 liquidation would likely result in an increase in Administrative Claims, because there would be an additional tier of Administrative Claims by the Chapter 7 trustee and his or her professionals. [4]   The Chapter 7 trustee's professionals, including legal counsel and accountants, would add administrative expenses that would be entitled to be paid ahead of Allowed Claims against the Debtor.  The estate would also be obligated to pay all unpaid expenses incurred by Unique Fitness during this Bankruptcy Case (such as compensation for professionals), which would continue to be allowed in the Chapter 7 case as well.  In addition, the cash to be distributed to Creditors and Holders of Equity Interests would be reduced by the Chapter 7 trustee's statutory fee, which is calculated on a sliding scale from which the maximum compensation is determined based on the total amount of moneys disbursed or turned over by the Chapter 7 trustee.

The Plan provides for payment of the priority tax claims in full with interest.  Plan payments to all creditors (secured, administrative, priority unsecured and general unsecured will be satisfied from Unique Fitness's disposable income, defined in Section 1191(d) of the Bankruptcy Code as income received by Unique Fitness that is not reasonably necessary to be expended for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the debtor.  In calculating disposable income, Unique Fitness will create and maintain a reserve account no larger than the sum of $10,000.00. Over the course of the Plan, Unique Fitness is projecting that disposable income will equal a total of $170,000.00. Unique Fitness will be preserving its operational and going concern integrity for the benefit of all creditors.  For all of these reasons, Unique Fitness believes that its Plan provides a recovery at least equal to, if not better than, the recovery in a Chapter 7 case for Holders of Claims and Equity Interests and, therefore, meets the requirements of the Best Interest Test.

Respectfully submitted this June 27, 2024

Respectfully Submitted,

Unique Fitness Concepts , LLC
Debtor herein.

By:   /s/ E. Philip Groben
One of its Attorneys

E. Philip Groben (ARDC# 6299914)
Email: pgroben@gcklegal.com
GENSBURG CALANDRIELLO & KANTER, P.C.
200 West Adams St., Ste. 2425
Chicago, Illinois 60606
Phone:  312-263-2200
Fax:  312-263-2242

---

[4] 11 U.S.C. § 326(a) states that a Chapter 7 trustee would incur trustee's fees equal to 25% of the first $5,000 of Liquidation Value of Assets; 10% of amount in excess of $5,000 but not in excess of $50,000 of Liquidation Value of Assets; 5% of any amount in excess of $50,000 but not in excess of $1,000,000; 3% of any amount in excess of $1,000,000 of the Liquidation Value of Asset.

**Exhibit "A"**
**Rejected Contracts**

**Exhibit "B"**
**General Unsecured Claims**

**Exhibit "C"**
**Projections of Disposable Income**

| Creditor | Claim | |
|---|---|---|
| Amazon Prime Lending | $ | 115,474.10 |
| Kapitus Servicing | $ | 324,978.12 |
| Bankers Healthcare Group | $ | 94,343.04 |
| Cloudfund LLC | $ | 61,920.00 |
| Rocket Capital | $ | 35,000.00 |
| Goldman Sachs Bank | $ | 125,000.00 |
| Select Funding | $ | 53,053.35 |
| Fundation Group | $ | 47,000.00 |
| Capiotal One | $ | 34,735.70 |
| Cellco d/b/a Verizon | $ | 1,212.03 |
| Chicago Infill | $ | 58,131.09 |
| Dept. Treasury | $ | 24,881.54 |
| Invacare Corp. | $ | 10,946.70 |
| Medline Industries | $ | 75,000.00 |
| PNC Bank N.A. | $ | 14,962.49 |
| PNC Bank N.A. | $ | 80,657.88 |
| PNC Bank N.A. | $ | 22,242.42 |
| Uline | $ | 542.14 |
| Wagento Creative | $ | 15,000.00 |
| | $ | **1,195,080.60** |

**Exhibit "D"**
**Liquidation Analysis**

**Exhibit C**

**Unique Fitness Concepts**
- SafeWell Medical Supply

| | Year 1 Post Bankruptcy | | | | | Year 2 Post Bankruptcy | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Total | Q1 | Q2 | Q3 | Q4 | Total |
| Month No. | 3 months | 3 months | 3 months | 3 months | 12 Months | 3 months | 3 months | 3 months | 3 months | 12 Months |
| Month Beginning | 8/26/2024 | 11/25/2024 | 2/24/2025 | 5/26/2025 | | 8/25/2025 | 11/24/2025 | 2/23/2026 | 5/25/2026 | |
| | | | | | | | | | | |
| Total Customer Sales | 143,750 | 226,000 | 293,000 | 366,600 | 1,029,350 | 378,000 | 396,000 | 415,000 | 441,000 | 1,630,000 |
| Medical Website Sales | 81,750 | 103,000 | 121,000 | 179,750 | 485,500 | 185,340 | 194,165 | 203,481 | 216,230 | 799,216 |
| Amazon Sales | 31,000 | 58,000 | 76,750 | 80,950 | 246,700 | 83,467 | 87,442 | 91,637 | 97,378 | 359,925 |
| Wal-Mart Sales | 16,000 | 33,500 | 48,250 | 53,125 | 150,875 | 54,777 | 57,385 | 60,139 | 63,907 | 236,208 |
| eBay Sales | 15,000 | 31,500 | 47,000 | 52,775 | 146,275 | 54,416 | 57,007 | 59,743 | 63,485 | 234,652 |
| Bonus Sales Increase | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | |
| Other Inflows | - | - | - | - | - | - | - | - | - | - |
| Asset Sales | - | - | - | - | - | - | - | - | - | - |
| Receivable Cash Receipts | 138,178 | 223,536 | 290,964 | 363,771 | 1,016,449 | 378,000 | 396,000 | 415,000 | 441,000 | 1,630,000 |
| **Total Cash Inflows** | 138,178 | 223,536 | 290,964 | 363,771 | 1,016,449 | 378,000 | 396,000 | 415,000 | 441,000 | 1,630,000 |
| | | | | | | | | | | |
| **Cash Expenses** | | | | | | | | | | |
| COGS(Cost of Goods Sold) | 93,438 | 146,900 | 190,450 | 238,290 | 669,078 | 245,700 | 257,400 | 269,750 | 286,650 | 1,059,500 |
| Marketing Expenses | 28,750 | 45,200 | 58,600 | 73,320 | 205,870 | 66,150 | 69,300 | 72,625 | 77,175 | 285,250 |
| **Operating Expenses** | | | | | - | | | | | |
| Total Operating Expenses | 13,295 | 26,787 | 35,276 | 43,523 | 118,880 | 58,625 | 59,734 | 60,904 | 62,506 | 241,768 |
| **Total Cash Outflows** | 135,483 | 218,887 | 284,326 | 355,133 | 993,828 | 370,475 | 386,434 | 403,279 | 426,331 | 1,586,518 |
| | | | | | | | | | | |
| **Quarter Operating Cash Flow** | 2,696 | 4,649 | 6,638 | 8,639 | 22,621 | 7,525 | 9,566 | 11,721 | 14,669 | 43,482 |
| | | | | | | | | | | |
| **Quarterly Fixed Payment to Creditors** | - | - | (5,000) | (10,000) | (15,000) | (10,000) | (10,000) | (10,000) | (10,000) | (40,000) |
| | | | | | | | | | | |
| | | | | | | | | | | |
| **Beginning Cash Balance** | 1,788 | 4,483 | 9,132 | 10,770 | 1,788 | 9,409 | 6,934 | 6,501 | 8,222 | 9,409 |
| **Ending Cash Balance** | 4,483 | 9,132 | 10,770 | 9,409 | 9,409 | 6,934 | 6,501 | 8,222 | 12,891 | 12,891 |
| | | | | | | | | | | |
| **Quarterly Cash Flow** | 7,790 | 12,226 | 24,558 | 31,152 | 75,726 | 8,201 | 10,275 | 12,463 | 15,458 | 46,398 |
| # of weeks | 13 | 13 | 13 | 13 | 52 | 13 | 13 | 13 | 13 | 52 |
| | | | | | | | | | | |
| **Administrative Claims Payments** | - | - | 5,000 | 10,000 | 15,000 | 10,000 | 10,000 | 10,000 | 10,000 | 40,000 |
| **IRS Tax  Claims Payments** | - | - | - | - | - | - | - | 5,000 | 5,000 | 10,000 |
| **Secured Creditor Claims Payments** | - | - | - | - | - | - | - | - | - | - |
| **Projected Disposable Income** | - | - | - | - | - | - | - | - | - | - |
| **Total Creditor & Admin Payments** | - | - | 5,000 | 10,000 | 15,000 | 10,000 | 10,000 | 15,000 | 15,000 | 50,000 |
| **Injunction Commitment** | - | - | - | - | - | - | - | - | - | - |

**Exhibit C**

**Unique Fitness Concepts**
- SafeWell Medical Supply

| | Year 3 Post Bankruptcy | | | | | Year 4 Post Bankruptcy | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Total | Q1 | Q2 | Q3 | Q4 | Total |
| Month No. | 3 months | 3 months | 3 months | 3 months | 12 Months | 3 months | 3 months | 3 months | 3 months | 12 Months |
| Month Beginning | 8/24/2026 | 11/23/2026 | 2/22/2027 | 5/24/2027 | | 8/23/2027 | 11/22/2027 | 2/21/2028 | 5/22/2028 | |
| Total Customer Sales | 456,000 | 465,000 | 475,000 | 491,000 | 1,887,000 | 501,000 | 510,000 | 519,000 | 528,000 | 2,058,000 |
| Medical Website Sales | 223,584 | 227,997 | 232,900 | 240,745 | 925,227 | 245,649 | 250,061 | 254,474 | 258,887 | 1,009,071 |
| Amazon Sales | 100,691 | 102,678 | 104,886 | 108,419 | 416,674 | 110,627 | 112,615 | 114,602 | 116,589 | 454,433 |
| Wal-Mart Sales | 66,080 | 67,384 | 68,834 | 71,152 | 273,450 | 72,601 | 73,905 | 75,210 | 76,514 | 298,230 |
| eBay Sales | 65,645 | 66,940 | 68,380 | 70,683 | 271,649 | 72,123 | 73,419 | 74,714 | 76,010 | 296,266 |
| Bonus Sales Increase | - | - | - | - | - | - | - | - | - | - |
| Other Inflows | - | - | - | - | - | - | - | - | - | - |
| Asset Sales | - | - | - | - | - | - | - | - | - | - |
| Receivable Cash Receipts | 456,000 | 465,000 | 475,000 | 491,000 | 1,887,000 | 501,000 | 510,000 | 519,000 | 528,000 | 2,058,000 |
| **Total Cash Inflows** | 456,000 | 465,000 | 475,000 | 491,000 | 1,887,000 | 501,000 | 510,000 | 519,000 | 528,000 | 2,058,000 |
| **Cash Expenses** | | | | | | | | | | |
| COGS(Cost of Goods Sold) | 296,400 | 302,250 | 308,750 | 319,150 | 1,226,550 | 325,650 | 331,500 | 337,350 | 343,200 | 1,337,700 |
| Marketing Expenses | 77,520 | 79,050 | 80,750 | 83,470 | 320,790 | 85,170 | 86,700 | 88,230 | 89,760 | 349,860 |
| **Operating Expenses** | | | | | | | | | | |
| Total Operating Expenses | 64,930 | 65,484 | 66,100 | 67,086 | 263,599 | 69,277 | 69,831 | 70,385 | 70,940 | 280,433 |
| **Total Cash Outflows** | 438,850 | 446,784 | 455,600 | 469,706 | 1,810,939 | 480,097 | 488,031 | 495,965 | 503,900 | 1,967,993 |
| **Quarter Operating Cash Flow** | 17,150 | 18,216 | 19,400 | 21,294 | 76,061 | 20,903 | 21,969 | 23,035 | 24,100 | 90,007 |
| **Quarterly Fixed Payment to Creditors** | (10,000) | (10,000) | (15,000) | (15,000) | (50,000) | (15,000) | (20,000) | (20,000) | (20,000) | (75,000) |
| **Beginning Cash Balance** | 12,891 | 20,041 | 28,257 | 32,657 | 12,891 | 38,952 | 44,855 | 46,824 | 49,859 | 38,952 |
| **Ending Cash Balance** | 20,041 | 28,257 | 32,657 | 38,952 | 38,952 | 44,855 | 46,824 | 49,859 | 53,959 | 53,959 |
| **Quarterly Cash Flow** | 17,966 | 19,048 | 20,250 | 22,173 | 79,437 | 21,800 | 22,881 | 23,963 | 25,045 | 93,689 |
| # of weeks | 13 | 13 | 13 | 13 | 52 | 13 | 13 | 13 | 13 | 52 |
| **Administrative Claims Payments** | - | - | - | - | - | - | - | - | - | - |
| **IRS Tax  Claims Payments** | 5,000 | 4,000 | - | - | 9,000 | - | - | - | - | - |
| **Secured Creditor Claims Payments** | 5,000 | 6,000 | 15,000 | 10,000 | 36,000 | 5,000 | - | 20,000 | 20,000 | 5,000 |
| **Projected Disposable Income** | - | - | - | - | - | 10,000 | 20,000 | 20,000 | 20,000 | 70,000 |
| **Total Creditor & Admin Payments** | 10,000 | 10,000 | 15,000 | 10,000 | 45,000 | 15,000 | 20,000 | 20,000 | 20,000 | 75,000 |
| **Injunction Commitment** | - | - | 10,000 | 10,000 | 20,000 | 10,000 | 10,000 | 10,000 | 10,000 | 40,000 |

**Exhibit C**

**Unique Fitness Concepts**
- SafeWell Medical Supply

| | Year 5 Post Bankruptcy | | | | |
|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Total |
| Month No. | 3 months | 3 months | 3 months | 3 months | 12 Months |
| Month Beginning | 8/21/2028 | 11/20/2028 | 2/19/2029 | 5/21/2029 | |
| | | | | | |
| Total Customer Sales | 535,000 | 539,000 | 544,000 | 553,000 | 2,171,000 |
| Medical Website Sales | 262,319 | 264,281 | 266,732 | 271,145 | 1,064,477 |
| Amazon Sales | 118,135 | 119,018 | 120,122 | 122,110 | 479,385 |
| Wal-Mart Sales | 77,528 | 78,108 | 78,833 | 80,137 | 314,605 |
| eBay Sales | 77,018 | 77,593 | 78,313 | 79,609 | 312,533 |
| Bonus Sales Increase | - | - | - | - | - |
| | | | | | |
| Other Inflows | - | - | - | - | - |
| Asset Sales | - | - | - | - | - |
| Receivable Cash Receipts | 535,000 | 539,000 | 544,000 | 553,000 | 2,171,000 |
| **Total Cash Inflows** | 535,000 | 539,000 | 544,000 | 553,000 | 2,171,000 |
| | | | | | |
| **Cash Expenses** | | | | | |
| COGS(Cost of Goods Sold) | 347,750 | 350,350 | 353,600 | 359,450 | 1,411,150 |
| Marketing Expenses | 88,275 | 88,935 | 89,760 | 91,245 | 358,215 |
| **Operating Expenses** | | | | | |
| Total Operating Expenses | 73,025 | 73,271 | 73,579 | 74,134 | 294,009 |
| **Total Cash Outflows** | 509,050 | 512,556 | 516,939 | 524,829 | 2,063,374 |
| | | | | | |
| **Quarter Operating Cash Flow** | 25,950 | 26,444 | 27,061 | 28,171 | 107,626 |
| | | | | | |
| **Quarterly Fixed Payment to Creditors** | (25,000) | (25,000) | (25,000) | (25,000) | (100,000) |
| | | | | | |
| | | | | | |
| **Beginning Cash Balance** | 53,959 | 54,909 | 56,353 | 58,414 | 53,959 |
| **Ending Cash Balance** | 54,909 | 56,353 | 58,414 | 61,585 | 61,585 |
| | | | | | |
| **Quarterly Cash Flow** | 26,907 | 27,408 | 28,034 | 29,161 | 111,510 |
| # of weeks | 13 | 13 | 13 | 13 | 52 |
| | | | | | |
| **Administrative Claims Payments** | - | - | - | - | - |
| **IRS Tax  Claims Payments** | - | - | - | - | - |
| **Secured Creditor Claims Payments** | - | - | - | - | - |
| **Projected Disposable Income** | 25,000 | 25,000 | 25,000 | 25,000 | 100,000 |
| **Total Creditor & Admin Payments** | 25,000 | 25,000 | 25,000 | 25,000 | 100,000 |
| **Injunction Commitment** | 10,000 | 10,000 | 15,000 | 15,000 | 50,000 |

**EXHIBIT D**

**Liquidation Analysis of Unique Fitness Concepts , LLC**

| Item | Liquidation value |
|---|---|
| Real Property | $0.00 |
| Personal Property | |
|     - Cash | $2,522.37 |
|     - Inventory | $1,627.96 |
|     - Office Furniture/Equipment | $700.00 |
|     - Intangibles and Intellectual Property | $Unknown |
|     - Inventory | $0.00 |
|     - Accounts Receivable | $2,590.97 |

**TOTAL LIQUIDATION VALUE OF DEBTOR'S ASSETS $7,441.30**

The following Secured Claims and Administrative Priority Claims, and Allowed Priority Claims that would need to be satisfied before any funds would be paid to unsecured creditors:

| Claimant | Liquidation Amount |
|---|---|
| Total Value of Debtor's Assets | $7,441.30 |
| Expected Administrative Claims | $50,000.00[i] |
| Funds Available for Secured Claims | $0.00 |
| Funds Available for Priority Claims | $0.00 |
| Available for Unsecured Creditors | $0.00 |

Before unsecured creditors would be paid any money, all claimants with a higher priority under 11 U.S.C. §507(a) must be paid in full from the proceeds of liquidation by a chapter 7 trustee. Under the above liquidation analysis, after claimants with higher priorities are paid, there would be approximately **$0.00** available to pay general unsecured creditors without priority.

---

[i] Subject to approval by the Bankruptcy Court